# EXHIBIT  3

# AFFIDAVIT

STATE OF WASHINGTON     )
                                } ss
COUNTY OF PIERCE         )

I, J. Mark Keller, being duly sworn, do hereby depose and state as follows:

## I. INTRODUCTION

I am a Lieutenant with the Washington State Liquor Control Board (WSLCB) who has been deputized as a Special Deputy United States Marshal, and who is assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, as a Task Force Officer (TFO) in the Yakima Field Office (and have been so assigned with the exception of two months since December 2003). I have been employed by the Washington State Liquor Control Board for 20 years.

I am familiar with and have received training regarding state and federal laws relating to the possession, distribution, transportation, delivery and sale of cigarettes. This includes those pertaining to the trafficking of contraband cigarettes. As discussed in more detail below, contraband cigarettes generally means packages of cigarettes upon which applicable taxes have not been paid as evidenced by the absence of a valid tax stamp.

I have been directly involved in the investigation described in this affidavit regarding contraband cigarette trafficking and other offenses. Other officers and agents from a variety of agencies have also been involved including the ATF, the Internal Revenue Service (IRS), the Washington State Liquor Control Board (WSLCB) and the Quinault Nation Narcotics Enforcement Team (QNNET).

The information in this affidavit is based upon my personal observations, as well as the observations and information provided to me by other agents and officers involved

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 1
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    in this investigation from the agencies referenced above.  In addition to this information, I
2    have also reviewed and relied upon information provided by the Federal Way
3    (Washington) Police Department, the Post Falls (Idaho) Police Department and the
4    Washington State Patrol.

5        The information contained in this affidavit is based on my own experience,
6    investigation, and observations, as well as information relayed to me by others with
7    knowledge of the investigation.  Because this affidavit is being submitted for the limited
8    purpose of establishing probable cause in support of an Application for Seizure Warrants,
9    I have not included every detail that I have learned over the course of the investigation.

10

11                          II. PURPOSE OF AFFIDAVIT
12       This affidavit is being submitted in support of an Application for Seizure Warrants
13   for the following properties:

14       a.    a white 2007 Chevrolet Box Van, Washington (WA) license #B42758E,
               VIN 1GBJG31U371145187, registered to Ed A. Comenout (Deceased);
15
16       b.    a white 2008 Chevrolet Silverado Pickup, WA license #B43062E, VIN
               1GCHK24K28E109739, registered to Robert R. Comenout, Sr.;
17
         c.    a black 2008 Chevrolet Tahoe 4D, WA license #163XLH, VIN
18             1GNFC13J78J182479, registered to Robert Comenout;
19
         d.    a black 2008 Dodge Charger 4D, WA license #AGZ1453, VIN
               2B3KA73W98H239635, registered to Jeremy R. Propst;
20
         e.    a white 2012 Mercedes-Benz Sprinter van, Idaho license #K499663, VIN
21             WD3PF4CC2C5631912, registered to Nicholas P. Matheson;
22       f.    a white 2004 Kia Sedona SUV, WA license AFL6317, VIN
               KNDUP131446600871, registered to Sandy V. Set;
23       g.    a red 2006 Dodge Ram 1500 Pickup, WA license #A65407Y,
               1D7HA18256S529667, registered to Dennis Harris, Jr.;
24
25       h.    a white 2003 Hummer H2, WA license #AHP0601, VIN
               5GRGN23UX3H147134, registered to Dennis Harris, Jr.;
26       I.    a gray 2009 Cadillac CTS-V, WA license #A1Z7783, VIN
               1G6DN57P290148380, registered to Dennis Harris, Jr. and Dawn N.
27             Howe;
28

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 2
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

j.    a silver 2009 Dodge Ram 3500 Pickup, Yakama Tribal Nation (YTN) license #381, VIN 3D6WH46A58G112787, registered to Trina A. Wheeler;

k.    a white 2008 Dodge Ram 3500 Pickup, YTN license #383, VIN 3D6WG46A47G737389, registered to Delbert A. Wheeler;

l.    a red 2008 Ford F150, WA license #B31983H, VIN 1FTPW14V78FB83785, registered to Sophia Comenout;

m.    Funds within Bank of America account #93605210, up to $26,500.00, in the name of Robert R. Comenout, Sr., and all proceeds generated therefrom; and,

n.    Funds within Bank of America account #36292407, up to $364,840.00, in the name of Edward A. Comenout, doing business as Indian Country Store, and all proceeds generated therefrom.

As set forth below, there is probable cause to believe that the above-named property(ies) constitute or are derived from proceeds traceable to the crime of trafficking in contraband cigarettes, in violation of Title 18, United States Code, Section 2342(a), which is a "specified unlawful activity" under Title 18, United States Code, Section 1956(c)(7)(A), and are therefore subject to seizure by, and forfeiture to, the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C); and/or,

There is probable cause to believe that the above-named property(ies) are vehicle(s) involved in the violation of transportation of contraband, in violation of Title 49, United States Code, Section 80302(b), and are therefore subject to seizure by, and forfeiture to, the United States, pursuant to Title 49, United States Code, Section 80303; and/or,

There is probable cause to believe that the above-named property(ies) constitute property(ies) involved in structured transactions in violation of Title 31, United States Code, Section 5324(a)(3), or property(ies) traceable to such violation, and are therefore subject to seizure and forfeiture to the United States, pursuant to Title 31, United States Code, Section 5317(c)(2) and Title 18, United States Code, Section 981(a)(1).

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 3
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

CONTRABAND CIGARETTES

Pursuant to Title 18, United States Code, Section 2341 et seq., Contraband Cigarette Trafficking Act (CCTA), it is unlawful for any person to knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes. The CCTA defines contraband cigarettes as:

a) A quantity "in excess of 10,000 cigarettes;"

b) That "bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes;" and

c) That "are in the possession of any person" who:

I) Does not hold a permit issued pursuant to Internal Revenue Service regulations as a manufacturer of tobacco products or as an export warehouse proprietor;

ii) Does not operate a customs bonded warehouse pursuant to the Tariff Act of 1930 nor is an agent of such a person;

iii) Is not a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill stating the quantity, source, and destination of such cigarettes;

iv) Is not licensed or otherwise authorized by the State where the cigarettes are found to account for and pay cigarette taxes imposed by such State, or who has failed to comply with the accounting and payment requirements relating to such license or authorization with respect to the cigarettes involved; or

v) Is not an officer, employee or other agent of the United States or a State, or any department, agency or instrumentality of the United States or a State having possession of such cigarettes in connection with the performance of official duties;

TRANSPORTATION OF CONTRABAND

Title 49, United States Code, Section 80302(b) specifies that a person may not transport contraband in a vehicle, conceal or possess contraband on a vehicle, or use a vehicle to facilitate the transportation, concealment, receipt, possession, purchase, sale, exchange, or giving away of contraband; specifically, cigarette(s) involved in the violation of Title 18, United States Code, Section 2342(a).

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 4
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

## STRUCTURED TRANSACTIONS

Based on my training, experience, and participation in financial investigations involving the concealment of funds and assets from the detection of the Internal Revenue Service (IRS) or other federal entities, I know that individuals involved in criminal activities frequently generate large amounts of cash from their criminal activities. One common method used to avoid the detection of both legal and illegal income is "structuring." All single cash transactions with banks and other financial institutions in excess of $10,000 must be reported to the government on a Currency Transaction Report ("CTR"). Structuring involves the repeated depositing or withdrawing of amounts of cash not exceeding the $10,000 limit, or the splitting of a cash transaction that exceeds $10,000 into smaller cash transactions, in an effort to avoid the reporting requirements. Even if the deposited and/or withdrawn funds are derived from legitimate means, financial transactions conducted in this manner are still in violation of federal criminal law, and the property involved in such transactions is subject to forfeiture to the United States.

## III. BACKGROUND

Through my training and experience in contraband cigarette investigations, I know that, except for businesses on United States military bases, generally all other businesses in the State of Washington that sell cigarettes to non tribal members are required to have a Washington tax paid stamp affixed to every pack of cigarettes. This requirement also applies to Indian smoke shop owners on tribal lands, who must have an inventory of Washington tax paid stamped product in order to lawfully sell cigarettes to non tribal members, unless they operate under the authority of, and in compliance with, the terms of an existing tax contract between the State of Washington and their tribe. In that case, cigarettes sold to non tribal members or the general public must bear authorized tribal tax stamps in lieu of Washington State tax stamps. Sometimes retail cigarette businesses in Washington, including smoke shops located on Indian reservations/trust lands, unlawfully sell cigarettes to non tribal members that do not bear either a Washington State tax paid

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 5
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  stamp or a valid tribal tax stamp.

2      These cigarette investigations have revealed that some Washington Indian

3  cigarette retailers travel to Idaho to purchase cigarettes. They do this because

4  Washington requires Indian smoke shops to collect cigarette taxes on all sales to non

5  tribal members, currently at a rate of $30.25 per carton. Idaho does not require Indian

6  smoke shops to collect taxes on sales to non tribal members. Thus a smoke shop owner in

7  Washington can drive to Idaho and purchase as many cigarettes as they want as long as

8  the Idaho Indian cigarette retailer/wholesaler agrees to the transaction. The enforcement

9  actions by the United States government over the past several years have led to some

10  Idaho Indian cigarette retailers/wholesalers being convicted of conspiracy, trafficking in

11  contraband cigarettes, RICO, and money laundering violations. The government was able

12  to show the cigarettes were smuggled or "bootlegged" from Idaho to Washington.

13      Once the cigarettes are smuggled back into Washington and are offered for sale,

14  the price is slightly below what the price would be at a normal retailer who has legally

15  stamped cigarettes for sale. However, the slight price difference is often sufficient to

16  attract customers from long distances away and these Indian smoke shops vastly outsell

17  other non Indian cigarette retailers and wholesalers creating tremendous profits.

18      Additional facts regarding this investigation can be found in the Application and

19  Affidavit for Search Warrants for the business of Indian Country Variety Store, a/k/a

20  Indian Country Store, a/k/a Indian Country Smoke Shop (ICSS) and related residences,

21  which is attached hereto and incorporated as if fully set forth herein (Attachment 1).

22

23                    IV. PROBABLE CAUSE

24  **The Indian Country Variety Store and the Comenout Family**

25      The Indian Country Variety Store, a/k/a Indian Country Smoke Shop, a/k/a Indian

26  County Store (ICSS) is located on a busy road (River Road) that connects Interstate 5 to

27  Puyallup and Auburn, Washington. The property on which ICSS is located contains a

28  main building and a trailer that is detached from the main building and sits on the edge of

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 6
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  the property closest to River Road.  ICSS mainly sells cigarettes but also sells other

2  tobacco products (OTP), candy, soft drinks, and Native American crafts at the main

3  building in the complex.  It is believed that only cigarettes are sold at the drive thru trailer

4  building.  ICSS is not licensed by the State of Washington as a cigarette wholesaler or

5  retailer.

6         ICSS is owned and operated by various members of the extended Comenout

7  family.  ICSS was formerly owned by Edward Comenout, Sr. (deceased).  When he died,

8  half of his ownership interest passed to his wife, Anna, and the other half passed to his

9  son, Edward Comenout, Jr.  When Edward Comenout, Jr. passed on, his ownership

10  interest was divided into fifths.

11         RCW 82.24.250(7) provides that the only persons or entities who are authorized to

12  possess unstamped cigarettes under Washington state law are limited to:

13    a.     Licensed wholesalers;

14    b.     The United States or an agency thereof; or

15    c.     Any person, including an "Indian tribal organization," or buyer or
          consignee of unstamped cigarettes, who

16

17         1)     Has pre-notified the WSLCB of the importation into
                Washington of the unstamped cigarettes; and

18         2)     Has, within the required period of time after the importation
                of the unstamped cigarettes, caused the cigarettes to be
19              stamped or otherwise made payment of the tax required by
                law in the manner required by Chapter 82.24 RCW.
20

21         None of the owners or operators of ICSS meet these requirements and as a result,

22  they are not persons "authorized by this chapter to possess unstamped cigarettes."  RCW

23  82.24.250(7).  Therefore, any unstamped cigarettes in their possession are contraband

24  under RCW 82.24.250(4).  The applicable Washington state taxes have not been paid on

25  the cigarettes as evidenced by the absence of a valid tax stamp on the cigarette packages.

26         In July 2008, pursuant to a Search Warrant, agents with the WSLCB seized

27  approximately 37,685 cartons of contraband cigarettes from ICSS, along with a small

28  amount of records and two computers.  The records seized included a price list for

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 7
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  cigarettes and other tobacco products and bank account records.  Most of the cigarettes

2  were stamped with Idaho Indian reservation stamps, which are not valid in Washington.

3  Some cigarettes did not bear any stamps.  No valid Washington stamps were found during

4  this search.  Also, a large amount of cash was located in a safe in the back room of the

5  main store at ICSS.  The cash was bundled with double bands.

6       Despite the execution of the warrant and the seizure of over 37,000 cartons of

7  contraband cigarettes, ICSS has continued to sell untaxed, unstamped contraband

8  cigarettes to the public.  In September 2008, less than two months after service of the

9  warrant, the WSLCB made two more purchases of cigarettes from ICSS.  All the

10  cigarettes purchased failed to carry a valid Washington State tax stamp.  Agents and

11  officers have continued to regularly purchase cigarettes from both the ICSS main store, as

12  well as the drive thru.  All of the cigarettes purchased were contraband.

13       The ICSS main store and drive thru's sources of untaxed and contraband cigarettes

14  are the same:  Nick Matheson and his businesses in northern Idaho on the Coeur d'Alene

15  Reservation and on the Puyallup Reservation in Milton, Washington, and King Mountain

16  Tobacco, Inc., located on the Yakama Reservation in Yakima County, Washington.

17       Nick Matheson owns Fightin' Creek Smoke Shop in Worley, Idaho, as well as

18  Baby Zack's Smoke Shop in Milton, Washington.  Members of the Comenout family

19  travel every week to Matheson's property in Idaho to purchase contraband cigarettes for

20  the main store at ICSS.  Both the main store and the drive thru also obtain contraband

21  cigarettes at Baby Zack's.

22       Much of Nick Matheson's cigarette business, which takes in tens of millions of

23  dollars each year, is conducted in cash.  He purchases cigarettes with large sums of cash

24  and those who buy from him often pay in cash.  However, it is believed that Matheson

25  does not report all of the cash income he receives and subsequently uses to purchase more

26  cigarettes.

27       The final source of the contraband cigarettes sold at ICSS is King Mountain

28  Tobacco, Inc.  King Mountain transports untaxed and contraband cigarettes every week in

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 8
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1 │ one of its trucks to ICSS, where it delivers to both the main store and the drive thru.

2

3 **Supply of Cigarettes to the ICSS Main Store**

4     The main store at ICSS appears to get its cigarettes from three sources. First, Lee

5 Comenout, Sr. and other family members travel to Nick Matheson's property in Worley,

6 Idaho, pick up cigarettes there and then transport those cigarettes back to the main store.

7 Second, Comenout family members and associates also travel to Nick Matheson's Baby

8 Zack's smoke shop in Milton, Washington, on a regular basis to pick up smaller amounts

9 of cigarettes.

10     Comenout family members have traveled to Nick Matheson's property in Idaho to

11 obtain cigarettes for ICSS for many years. For example, George W. Gardee was the

12 passenger in a vehicle stopped by the WSP on May 26, 2005, on I 90 near Ritzville,

13 Washington. Although a passenger, the truck was registered to Gardee. The truck

14 contained 241 cartons of cigarettes. These cigarettes had no valid Washington stamps,

15 only Coeur d'Alene tribal stamps.

16     After being advised of his Miranda rights, Gardee stated he represented the

17 business interest of ICSS. Gardee stated that he was in charge of monitoring and

18 maintaining the cigarette and OTP inventory at that business, including obtaining

19 additional product when needed. Gardee stated that he made two to three trips per week

20 to smoke shops located in Idaho to purchase cigarettes and OTP for ICSS. Gardee

21 purchased the cigarettes and OTP from whichever smoke shop had the lowest prices,

22 including Nick Matheson's Fightin' Creek Smoke Shop. Gardee produced receipts

23 showing that the cigarettes located in the vehicle were purchased on that date (May 26,

24 2005) from Fightin' Creek Smoke Shop, located at 23181 S. Highway 95, Coeur d'Alene,

25 Idaho. Gardee also stated some of the cigarettes in his vehicle were purchased at

26 Adeline's. The WSLCB seized the cigarettes as contraband under state law.

27     When asked if he was an owner or an employee of ICSS, Gardee responded that he

28 worked for his cousin, Dennis Harris. When asked if Gardee was being paid by Harris or

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 9
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    by ICSS, Gardee responded that the business had not yet made any money and he had not

2    received any pay for his efforts to date.  Gardee stated he had only worked for ICSS for a

3    month or less, but had been involved in family owned smoke shops since he was 12 years

4    old.  Gardee was 24 years old at the time of this incident.

5         More recently, Idaho police investigated Lee Comenout Sr.'s involvement in

6    transporting cigarettes from Idaho.  On February 22, 2011, the Post Falls, Idaho, Police

7    Department responded to the Riverbend Inn located in Post Falls, Idaho, regarding a

8    report by hotel staff.  Upon arrival, the Post Falls Police Department was notified by hotel

9    staff that the smell of marijuana was coming from one of the rooms. The police made

10   contact with the occupants of the room: Lee Comenout Sr., and his children, Errol and

11   Anna.  After a consent search, the police located a bag of marijuana, a black bag

12   containing $2,500 in cash in $20 denominations, two plastic bags containing prescription

13   pills, and other drug paraphernalia.  After being given a Miranda warning, Lee Sr.

14   confessed that the marijuana was his.  Errol stated the currency was his life savings, but

15   could not explain how he got the currency, or paid for the pills in his possession, as he did

16   not have a job.  An additional bag of marijuana was located in Anna's purse.  All amounts

17   of narcotics were user quantities.  An additional $1,800, all in $100 bills, was located in

18   the possession of Lee Sr.

19

20   **White 2007 Chevrolet Box Van**

21        The police determined that a white 2007 Chevrolet box Van, Washington license

22   #B42758E, VIN 1GBJG31U371145187, parked in the hotel lot belonged to the

23   Comenouts.  Lee Sr. stated the vehicle was his "work truck."  The Chevrolet van was

24   registered to Ed A. Comenout (deceased as of June 2010, but the vehicle remains

25   registered in his name).  Lee Sr. consented to a search of the Chevrolet van and said it

26   was loaded with cigarettes.  Lee Sr. stated he had no problem speaking to the police about

27   his drug use but advised he did not want to talk about the cigarettes.  Lee Sr. advised he

28   had an open case regarding cigarettes, and that he had an attorney for this matter and was

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 10
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  not at liberty to discuss it.

2      The search of the Chevrolet van revealed approximately 5,480 cartons of cigarettes
3  (over 1 million individual cigarettes) which were stamped with Coeur d'Alene Indian
4  Reservation stamps.  An invoice, which did not bear the name of the seller, was recovered
5  with the cigarettes and stated the cost of the cigarettes to be $119,666.  The invoice stated
6  "Sent 108,000.00" and "balance 12,931.00."  The date of the invoice was "2 22."  Police
7  seized the Chevrolet van and the cigarettes.

8      The following day, February 23, 2011, the police released the Chevrolet van and
9  the cigarettes back to the Comenouts because those cigarettes were not contraband in
10  Idaho.  Officers with the WSLCB placed the Chevrolet van under surveillance when it
11  left Post Falls, Idaho, anticipating that it was destined for ICSS.  Instead of the vehicle
12  heading to Washington, it traveled to Matheson's Fightin' Creek Smoke Shop, 23181 S.
13  Highway 95, Coeur d'Alene, Idaho, on the Coeur d'Alene Indian Reservation near
14  Worley, Idaho.  Due to severe weather conditions, surveillance of the vehicle was
15  terminated.

16      The Comenouts and their associates have continued to use the Chevrolet van to
17  transport cigarettes from Idaho to ICSS.  On March 28, 2012, agents and officers
18  investigating this matter obtained a warrant to place an electronic GPS tracking device on
19  the Chevrolet van, which was subsequently installed.

20      The electronic and visual surveillance of the Chevrolet van reveal a reliable pattern
21  involving the weekly transport of cigarettes from Nick Matheson's property in Idaho to
22  the ICSS main store.   The trips to Idaho occur every week, usually on Wednesdays.  Lee
23  Sr. appears to be the primary driver of the Chevrolet van and he is typically accompanied
24  by another person.

25      The Chevrolet box van usually makes two stops in Idaho relative to the violations
26  alleged in this Affidavit.  First, it typically stops at Fightin' Creek Smoke Shop, in Coeur
27  d'Alene, Idaho, for a short time (less than ten minutes.).  In addition, the Chevrolet van
28  also makes a stop at Nick Matheson's property located to the north and west of the

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 11
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   intersection of Highway 95 and West Elder Road. This property includes several

2   structures, including Matheson's residence at 13145 West Elder Road and an outbuilding

3   located approximately 200 meters away with the address of 13155 West Elder Road.

4   These locations are less than two miles from Fightin' Creek Smoke Shop. GPS data

5   indicates the box van usually stops at the outbuilding located at 13155 West Elder Road

6   and stays there an average of 30 minutes.

7       The vehicle then returns to the Tacoma/Puyallup area late on Wednesday night or

8   very early on Thursday morning. Early on Thursday mornings, sometimes with other

9   family members, Lee Sr. drives the van to ICSS. There, the box van is backed up to a

10  door located on the east end of the ICSS complex. Usually within approximately 20 to 30

11  minutes, the door opens and several persons appear to unload the van.

12      Cigarettes are unloaded from the Chevrolet van and carried into ICSS. Agents and

13  officers have seen numerous varieties of cigarettes unloaded, including Carnival, Misty,

14  Marlboro, Camel and Virginia Slims. These brands are usually seen in half cases, which

15  indicates the packs may have been stamped at some point. Purchases of cigarettes from

16  ICSS by undercover agents show that many packs purchased had Coeur d'Alene Tribal

17  stamps. ICSS is not known to have a cigarette stamping machine. However, Nick

18  Matheson has stated he has a stamping machine at his residence, which is located in

19  Worley, Idaho.

20      In addition, agents and officers have also seen full cases of "305's" brand of

21  cigarettes unloaded from the box van on Thursday mornings. These cases of 305's appear

22  to be unopened, which indicates the cigarettes are likely not stamped. This is supported

23  by undercover purchases of 305's from ICSS, none of which had any tax stamps on them.

24      This pattern route is confirmed by a check of the Post Falls Police Department

25  cameras, which photograph vehicles entering Idaho on I 90 and traveling on some other

26  roads in the Post Falls/Coeur d'Alene area. A review of footage from these cameras show

27  that between January 25, 2011, and December 14, 2011 the white 2007 Chevrolet van

28  with Washington license B42758E had passed through the area on 22 separate occasions.

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 12
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  These photos are consistent with travel routes from ICSS to the Coeur d'Alene Indian

2  Reservation.  It should be noted that not all routes of travel to and from Washington into

3  northern Idaho are covered by cameras.

4          Agents and officers have seen 80 to 140 cases of cigarettes (960,000 to 1.68

5  million cigarettes) unloaded from the box van each week and taken into the main store at

6  ICSS.

7

8  **A White 2008 Chevrolet Silverado Pickup**

9          Cigarettes are also delivered to ICSS using a white 2008 Chevrolet Silverado

10  Pickup, Washington license #B43062E, VIN 1GCHK24K28E109739.  This vehicle is

11  registered to Robert R. Comenout Sr.

12          On February 29, 2012, WSLCB Lieutenant Al Anderson observed the Chevrolet

13  pickup truck, which was towing a two axle trailer, backed up to the east end of the main

14  store at ICSS near the door through which cigarettes from the white box van are usually

15  unloaded.  The rear doors to the pickup canopy area were open and Lt. Anderson

16  observed, inside the bed of the pickup truck, brown cardboard boxes resembling the size

17  and shape of boxes that are consistent with the way that cigarettes are packaged.  Based

18  on his training and experience in conducting investigations involving cigarettes over the

19  past 11 years, he believed the boxes' appearance were consistent with the way full cases

20  of cigarettes are regularly packaged.  Lt. Anderson observed a male individual unloading

21  the boxes from the pickup truck onto a four wheel hand cart.  The cart, when loaded,

22  appeared to hold four to five boxes.  The boxes were then taken into ICSS.

23          The Post Falls, Idaho, Police Department operates cameras that photograph

24  vehicles entering Idaho on I-90 and traveling on certain other roads in the Post

25  Falls/Coeur d'Alene area.  These cameras showed that the Chevrolet pickup truck passed

26  through that area on November 22, 2011, February 28, 2012, and March 13, 2012.  The

27  roads traveled by this vehicle can be used to access the Coeur d'Alene Indian Reservation

28  and the tribal smoke shops in that area, including Fightin' Creek.

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 13
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   The white Chevrolet pickup truck has also been used to pick up cigarettes at Baby

2   Zack's, which is owned by Nick Matheson, and to deliver those cigarettes to ICSS. The

3   agents and officers investigating this matter obtained on March 28, 2012, a warrant to

4   install a GPS tracking device on this pickup, which was subsequently placed on the

5   vehicle. The tracker showed that on March 29, 2012, the Chevrolet pickup truck was

6   driven to Baby Zack's. During this trip to Baby Zack's, the vehicle engaged in maneuvers

7   consistent with counter surveillance, specifically by driving in a wide loop near the

8   business rather than traveling straight to the destination at Baby Zack's.

9   The GPS tracker showed that the Chevrolet pickup truck initially appeared to be

10  parked near the loading area of Baby Zack's but was later moved to the front of the

11  business before being driven back to ICSS, arriving at 4:51 p.m. When it arrived at the

12  main store, agents and officers observed two persons unloading boxes appearing to be of

13  the size that could carry cigarettes.

14  On June 15, 2012, the pickup was observed by Criminal Investigator (CI) Doug

15  Smythe, of the Quinault Nation Narcotics Enforcement Team (QNNET), at Baby Zack's.

16  When it subsequently arrived at the main store later that same day, CI Smythe observed

17  persons unloading boxes appearing to be the size and shape that could carry cartons of

18  cigarettes and taking them into the main store.

19  Beginning in mid-August, 2012, the Comenouts appear to have taken to using the

20  white Chevrolet pickup, along with a towed trailer, to make the weekly trips to Idaho to

21  pick up the cigarettes from Nick Matheson. The box van made a trip to Idaho on August

22  8-9, 2012 and was not used to transport cigarettes again until it was observed making a

23  round trip to Matheson's property on September 12-13, 2012. After the trip on August 8 -

24  9, 2012, the white pickup was seen in the ICSS parking area hooked to a U-Haul trailer.

25  On Thursday, August 23, 2012, and Thursday, September 6, 2012, agents and officers

26  observed cigarettes being unloaded at the usual early morning time from the white pickup

27  and attached U-Haul trailer into the ICSS main store. Specifically, agents and officers

28  saw approximately 91 full and 37 half cases of cigarettes unloaded into the main store on

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 14
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   August 23, 2012, and 114 full and 50 half cases of cigarettes unloaded into ICSS on

2   September 6, 2012.

3

4   **Black 2008 Chevrolet Tahoe 4d**

5       A black Chevrolet Tahoe 4d, Washington license #163XLH, VIN

6   1GNFC13J78J182479, has also been used to transport cigarettes from Baby Zack's to the

7   main store at ICSS. This vehicle is registered to Robert and Marlene Comenout. Robert

8   Comenout is the son of Robert Comenout, Sr., and owns a residence in Puyallup, WA.

9       On July 24, 2012, the black Chevrolet Tahoe was observed at Baby Zack's. When

10  it subsequently arrived at the main store later that same day, I saw persons unloading

11  boxes appearing to be the size and shape that could carry cartons of cigarettes and taking

12  them into the main store. The Tahoe has been observed at Baby Zack's and then, shortly

13  after leaving there, at ICSS on other dates, specifically June 12, 2012, and July 10 and 17,

14  2012.

15

16  **Black 2008 Dodge Charger 4d**

17      Cigarettes for the ICSS drive thru are also obtained at Baby Zack's. Jeremy Propst

18  is involved in the operation of the drive thru and is there on a regular basis including

19  being present at times during the unloading of cigarettes delivered to the drive thru from

20  Baby Zack's. Jeremy has also been observed opening the door to the drive thru with the

21  keys on a Sunday when the drive thru was closed. Jeremy does not appear to be an

22  enrolled member of any federally recognized Indian tribe, nor does he appear to be related

23  to the extended Comenout family. Despite this, a Petition for Probate filed with the

24  Quinault Nation Tribal Court in March 2012 states that Jeremy operates the drive thru

25  cigarette business at ICSS. According to the Petition, although Robert Comenout, Sr. and

26  other family members have asked Jeremy and his partners in the drive thru to vacate and

27  leave the drive thru, those persons have refused to do so.

28      A review of Washington State Department of Licensing (WADOL) records

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 15
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  discloses that Jeremy Propst is the current registered owner of a Black 2008 Dodge

2  Charger 4d, Washington license #AGZ1453, VIN 2B3KA73W98H239635.  A review of

3  documents surrounding the purchase of this vehicle discloses that Propst purchased the

4  above vehicle from a car dealership in Puyallup, Washington, on December 17, 2011, and

5  used $13,700 in currency for the purchase.  WADOL records also disclose that Jeremy

6  Propst is the legal owner of the 2008 Dodge Charger, signifying that Propst did not need a

7  loan to purchase it.  Jeremy Propst listed his occupation as "Smoke Shop Sales" on

8  records associated with this transaction.

9       Records obtained from the Washington State Employment Security Department

10  (WSESD) show that for the period July 1, 2011, through June 30, 2012, Jeremy Propst

11  did not have any wages reported for any employment in the State of Washington.

12

13  **White 2012 Mercedes Benz Sprinter Van and a White 2004 Kia Sedona SUV**

14       The typical pattern of cigarette deliveries to the ICSS drive thru are based on

15  visual surveillance by agents and officers, as follows:  Generally, each Tuesday and

16  Friday, a white 2012 Mercedes Benz Sprinter Van, Idaho license #K499663, VIN

17  WD3PF4CC2C5631912, arrives at the back gate of Baby Zack's in the afternoon hours.

18  This van is registered to Nicholas Patrick Matheson/Jess's Wholesale in Worley, Idaho.

19  The Sprinter van backs into a fenced area on the south side of Baby Zack's where it stays

20  for only a short time.  Usually within several minutes after the Sprinter van leaves, a

21  white 2004 Kia Sedona SUV, Washington license AFL6317, VIN

22  KNDUP131446600871, pulls up in front of the gated area and also backs into the area,

23  after which the gates are shut.  The driver of the Kia Sedona is usually Steven Propst.

24  The Kia Sedona is registered to Sandy Set, who appears to live with Steven Propst.

25  Specifically, the address on Steven Propst's driver's license is the same address as Ms.

26  Set's in Auburn, Washington.

27       On three occasions, including most recently July 31, 2012, agents and officers

28  observed Steven Propst entering or exiting Baby Zack's.  Within 30 minutes after leaving

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 16
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Baby Zack's the Kia Sedona is usually seen at the ICSS drive thru where agents and

2  officers have routinely observed full and half cases of cigarettes being unloaded from the

3  Kia Sedona and taken into the drive thru.

4         On almost all occasions, the Kia minivan does not stay long at Baby Zack's.

5  Within 30 minutes after leaving Baby Zack's the minivan is usually seen at the ICSS drive

6  thru where agents and officers have routinely observed full and half-cases of cigarettes

7  being unloaded from the minivan and taken into the drive thru.  Specifically, agents and

8  officers have seen the pattern described above on the following dates:  June 8, 12, 15, 19,

9  22, and 26, 2012; July 3, 6, 10, 13, 17, 24, 27, and 31, 2012; and August 3, 7, 14, 17, 21,

10  24 and 28, 2012.

11

12  **Dennis Harris:  Operation and Management of the Drive Thru at ICSS**

13         On May 28, 2011, the Federal Way Police Department responded to the residence

14  of Dawn Howe and Dennis Harris, 1708 South 371st Court, Federal Way, Washington,

15  regarding a domestic dispute.  After finding narcotics (marijuana) at the residence, the

16  police sought and obtained a search warrant from Federal Way Municipal Court, in King

17  County, for evidence relating to the domestic dispute and narcotics.  Located in the

18  master bedroom, under a desk in several shoe boxes, was a large sum of cash totaling

19  $549,977.45.

20         Some of the almost $550,000 in cash seized from Harris' residence by Federal Way

21  police was in plastic bags bearing the name, address and telephone number for Indian

22  Country Variety Store, another name used by ICSS.  The bags are white in color and bear

23  the name of the ICSS (Indian Country Variety Store) in bold, blue lettering.  In addition,

24  the cash was held together by double bands.  As noted above, photographs taken by

25  WSLCB agents during the execution of the state search warrant in July 2008 showed a

26  large sum of money in a safe at the ICSS main store, double banded and packaged in the

27  same manner.

28         In a statement given to the police, Ms. Howe stated that she had been employed at

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 17
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  the ICSS and that Dennis Harris was her supervisor at ICSS.  In addition, several

2  documents taken during the Federal Way search connected Howe and Harris to ICSS.

3  Specifically, authorities found an application for rental agreement in which Harris was

4  identified as a supervisor at ICSS, as well as weekly time cards for employees there.  The

5  time cards were marked "paid cash" and contain what appears to be Harris' signature.  A

6  currency counting machine was also seized at the residence in the bedroom where most of

7  the currency was located.

8      On May 31, 2011, Federal Way Police Department Detective Brian Klingele

9  contacted Dennis Harris by telephone.  Harris stated that some of the over $500,000

10  recovered from his residence was his and that the money was proceeds from a local

11  smoke shop that he (Harris) managed.

12      On June 3, 2011, ATF Asset Forfeiture Investigator (AFI) Roosendaal,

13  accompanied by officers of the Federal Way Police Department, visited ICSS and was

14  told by employees of the main store that Dennis Harris operates the drive thru on the

15  property.  This corroborates the statement made by George Gardee to law enforcement in

16  2005 that he worked for Harris in the cigarette business at ICSS.

17

18  **Red 2006 Dodge Ram 1500 Pickup; White 2003 Hummer H2; and Gray 2009**

19  **Cadillac CTS V**

20      A review of WADOL records shows Dennis Harris is the current registered and

21  legal owner of a red 2006 Dodge Ram 1500 Pickup, Washington license #A65407Y,

22  1D7HA18256S529667.  A review of the records obtained for the purchase shows that

23  Harris purchased the above vehicle for $16,322.50 from Market Place Auto in Puyallup,

24  Washington, on June 27, 2011.  On June 27, 2011, Dennis Harris deposited $7,500 cash

25  to his personal Bank of America account and withdrew that exact amount to purchase a

26  Bank of America cashier's check made payable to Market Place Auto.  The records

27  identify Harris as the legal owner, indicating Harris also paid the remaining $8,822.50 at

28  the time of purchase.

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 18
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

A review of WADOL records also show that Dennis Harris is the current registered and legal owner of a white 2003 Hummer H2, Washington license #AHP0601, VIN 5GRGN23UX3H147134.  A review of records surrounding the purchase of this vehicles shows that Harris purchased the 2003 Hummer H2 for $23,999 from Auburn Auto Pointe in Auburn, Washington, on March 17, 2012.  WSDOL records disclose that Dennis Harris is the legal owner of the 2003 Hummer H2, signifying that he did not need a loan to purchase it.

A review of WADOL records further show that Dennis Harris and Dawn Howe are the current registered owners of a 2009 Cadillac CTS-V, License #A1Z7783, VIN 1G6DN57P290148380.  A review of records surrounding the purchase of this vehicle shows that Harris and Howe purchased the 2009 Cadillac CTS-V on or about August 24, 2012.  WADOL records disclose that Harris and Howe are the legal owners of the 2009 Cadillac CTS-V, signifying that they did not need a loan to purchase it.

Harris has no known source of employment income other than ICSS.  Records from the WSESD show that neither Harris nor Ms. Howe had any reported wages from the third quarter of 2011 through the second quarter of 2012.  Harris receives checks from the Muckleshoot Tribe, but the amount of those checks is generally not sufficient to support payments on his housing and automobiles.

Although Harris does not appear to work a shift at the drive thru, he is seen there on a regular basis.  For example, on May 4, 2012, Harris was observed assisting in unloading approximately 14 cases of cigarettes from the white Kia Sedona, and taking them into the drive thru.  Similarly, on August 14, 2012, Harris was again seen assisting in the unloading of 12 full and 16 half cases of cigarettes from the Kia Sedona into the drive thru.  He has been observed on numerous occasions walking into and out of the drive thru without knocking, talking to others working at the drive thru and has been present at other times when cigarettes were delivered (although he did not assist in the unloading on those occasions).

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 19
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**Supply of Cigarettes to the ICSS Main Store and Drive Thru from King Mountain Tobacco**

King Mountain Tobacco Company, Inc., is a cigarette manufacturer located in White Swan, Washington. It is based on the Yakama Reservation in Yakima County, Washington. Agents and officers have observed trucks registered to Trina Wheeler and Delbert Wheeler (owners of King Mountain Tobacco Company, Inc.) make weekly deliveries of cigarettes to both the main store and the drive thru at ICSS.

**Silver 2009 Dodge Ram 3500 Pickup and White 2008 Dodge Ram 3500 Pickup (King Mountain Trucks)**

To date, two different trucks registered to Delbert or Trina Wheeler, bearing Yakama Nation license plates 383 and 381, have been utilized for the deliveries of cigarettes to the ICSS main store and drive thru. Two of these trucks are identified as follows: a silver 2009 Dodge Ram 3500 Pickup, license #381(Yakama Tribal Nation plate no.), VIN 3D6WH46A58G112787, registered to Trina A. Wheeler, and a white 2008 Dodge Ram 3500 Pickup, license #383 (YTN), VIN 3D6WG46A47G737389, registered to Delbert A. Wheeler. The Wheelers and those who work for King Mountain Tobacco are believed to be members of the Yakama Tribe. It is believed that Trina Wheeler is Delbert Wheeler's wife.

These deliveries to ICSS almost always occur on Wednesdays, usually between 8:30 a.m. and 10:30 a.m. The pattern is the same each week. A King Mountain truck first backs up to the drive thru where 10 to 15 full cases are removed from the truck and placed into the drive thru trailer by a passenger of the truck and workers at the drive thru. These full cases are unopened, which indicates the cigarettes are unstamped and therefore contraband. All of the undercover purchases of King Mountain cigarettes have been of unstamped packages.

Once the delivery is made to the drive thru, the truck moves over to the main store of ICSS and backs up to the door on the east side of the building used for other cigarette

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 20
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   deliveries.  Approximately 10 to 30 full cases of King Mountain cigarettes are then

2   unloaded from the truck and taken into the main store.  Again, because the cases are

3   unopened, the cigarettes inside them are believed to be unstamped, and therefore

4   contraband.

5           After the truck is moved over to the main store, the driver of the truck usually

6   walks over to the drive thru, where the driver receives what appears to be a plastic sack.

7   The driver then takes the sack and places it behind the driver's seat.  On several

8   occasions, agents and officers have observed Steven Propst handing the plastic sack to the

9   driver of the King Mountain truck.  The sack is believed to contain payment, in cash, for

10  the delivery of the cigarettes.  On those occasions when agents and officers can plainly

11  see the bags, they appear to contain the same markings as the bags containing currency

12  seized from Dennis Harris, Jr.'s residence in May 2011.  Those bags, white in color,

13  contain the name and telephone number of the ICSS (Indian Country Variety Store) in

14  bold, blue lettering.

15          After receiving the plastic sack at the drive thru, the driver of the King Mountain

16  truck usually will enter the main store and return with another plastic sack.  This occurs

17  only after the cigarettes have been completely unloaded from the truck.  The sack

18  received from the main store is also placed behind the front seat of the truck and it then

19  leaves ICSS.

20          On June 13-14, 2012, ATF Special Agent (S/A) Goodpaster and ATF TFO Lee

21  Boling conducted surveillance on ICSS.  June 13, 2012, was a Wednesday and, consistent

22  with the above-described pattern, a King Mountain truck made its deliveries to ICSS,

23  including the drive thru, that morning.  Later that evening after the drive thru closed, S/A

24  Goodpaster and TFO Boling observed an employee of the drive thru exit the trailer with

25  what appeared to be a white plastic garbage bag.  The employee placed the bag next to a

26  dumpster located to the west of the drive thru.  Several hours later, S/A Goodpaster and

27  TFO Boling picked up the white plastic bag, which was still sitting next to the dumpster

28  and found among the contents of the bag an invoice from King Mountain Tobacco.  The

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 21
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

invoice, dated June 13, 2012, contained a section entitled "bill to," in which was written, "Indian Country Store, 908 B River Road, Puyallup, Wa. 98371." The invoice reflected a purchase of 840 cartons (14 full cases) of King Mountain cigarettes for $15,540.00. Under the "Terms" section of the invoice are the words "Due on receipt."

Agents and officers investigating this matter have since approximately March 2012 observed trucks registered to Delbert Wheeler or Trina Wheeler make weekly deliveries of King Mountain cigarettes to both the main store and the drive thru at ICSS.

### Red 2008 Ford F150

It is believed that Sophia Comenout is the wife of Robert Comenout, Sr. Records received from Bank of America reveal that she receives checks from the Washington Department of Social and Health Services issued as early as November 18, 2009, made payable to her at the address associated with Robert Comenout, Sr. (908 River Road, Apt. B, Puyallup, WA 98371), and deposits those checks to a Bank of America account maintained by Robert, Sr. She also has been listed with Robert, Sr. in articles appearing in various local publications. In addition, Sophia Comenout has been observed on numerous occasions by officers and agents conducting surveillance at the ICSS. Although her role in the operation of the ICSS is unclear, she appears to be an employee at the main store.

A review of WADOL records shows that Sophia Comenout is the current registered owner of a red 2008 Ford F150, Washington license #B31983H, VIN 1FTPW14V78FB83785. Records surrounding the purchase of this vehicle reflect that she purchased the 2008 Ford F150 for $22,140.00 [1] from Harnish Buick in Puyallup, Washington on June 13, 2012. Sophia Comenout paid $20,000 in cash ($10,000 of this was provided in $100 bills or higher). The remaining $2,140.00 was paid with a

---

[1] The vehicle Certificate of Ownership lists the purchase price as $24,813, but the IRS form 8300 lists the purchase price as $22,140. A purchase price of $22,140 correlates with the $20,000 cash payment and the $2,140 drawn from Bank of America Account #xxxx5210, to Harnish Buick.

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 22
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  withdrawal of funds drawn from Robert R. Comenout Sr.'s Bank of America Account

2  #xxxx5210, payable to Harnish Buick.

3      Information obtained from the WSESD reflect that as far back as 2004, Sophia

4  Comenout has not had any employment wages reported from employment in the State of

5  Washington.

6

7  **Funds Within Bank of America Account #xxxx2407, up to $364,840.00**

8      ATF Forensic Auditor Guy Hummel has examined records for bank accounts

9  controlled by the owners and operators of ICSS, obtained from Bank of America,

10  specifically with respect to the checking account in the name of Edward A. Comenout,

11  dba Indian County Store  (number xxxx2407).  Records for this account disclose that

12  Edward A. Comenout opened the account as the owner of ICSS in 2006 (as previously

13  noted, Edward A. Comenout is deceased as of June 2010).  In Quinault Tribal

14  proceedings following Edward A. Comenout's death, it was "agreed with Robert R.

15  Comenout, Sr. that the Indian Country Store should be run as a native Indian enterprise

16  and wholly owned family business, managed by Robert R. Comenout, Sr., the decedent's

17  brother and business partner."  It is believed that the surviving owners, operators and

18  managers of the ICSS have continued to use checking account number xxxx2407 as a

19  business account for the ICSS, as specified on the signature card associated with the

20  account (Edward A. Comenout, Doing Business As Indian Country Store.)

21      An analysis of deposits into Bank of America checking account number xxxx2407

22  for the period July 8, 2011 through August 7, 2012 establishes a definitive pattern of

23  structured currency deposits.  A schedule of deposits for the period January 2011 to

24  August 2012 prepared by Auditor Hummel shows a total of $364,840 in structured

25  deposits.  *See* Attachment 2, attached hereto and incorporated as if fully set forth herein.

26      Almost all of the currency deposits are in even dollar amounts (i.e., $5,000 to

27  $9,000), and none of the currency deposits are greater than $10,000.  In addition, 26 of

28  the deposits (totaling $234,000) between the period July 2011 and August 2012 are

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 23
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    exactly $9,000, which is indicative of an attempt to structure deposits.

2       Further analysis of the account reflects the following:

3           •   $16,687.18: account balance as of 12/31/10;

4           •   $364,840.00: cash deposits;

5           •   $29.41 interest earned;

6           •   $31,359.00 withdrawals/deductions (other than for deposit corrections; and,

7

8           •   $350,197.59: balance as of 8/31/12

9 **Funds Within Bank of America Account #xxxx5210, up to $26,500.00**

10       ATF Forensic Auditor Guy Hummel has also examined records for a bank account

11 controlled by Robert Comenout, Sr., specifically Bank of America checking account

12 number xxxx5210 in the name of Robert R. Comenout, Sr., POD Edwin B. Comenout,

13 908 River Road, Suite B, Puyallup, WA 98371-4169. Records for this account disclose

14 that Robert Comenout, Sr. updated the signature card for this account on April 26, 2011,

15 although Bank of America records indicate the account was opened sometime before

16 January 2008.

17       An analysis of deposits into checking account number xxxx5210 revealed currency

18 deposits of $9,000, $8,000 and $9,500, made during the period September 13, 2011,

19 through November 29, 2011. All of these deposits were made at a Bank of America

20 branch located less than two miles from ICSS, in Puyallup, Washington. Deposits of this

21 nature are indicative of attempts to structure deposits of currency to avoid the filing of

22 Currency Transaction Reports (CTRs) by the Bank of America. Furthermore, my

23 investigation of the owners of ICSS makes it clear that they generate large amounts of

24 currency on a daily basis from the sale of contraband cigarettes. Robert Comenout, Sr. is

25 one of the owners of the ICSS.

26       It is believed that the owners and operators of the ICSS purposely conduct their

27 banking in this manner to avoid the filing of Currency Transaction Reports (CTRs),

28 which are required for currency deposits in excess of $10,000. The manner in which the

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 24
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  owners and operators of ICSS structured these deposits into checking account numbers

2  xxxx2407 and xxxx5210 further supports the theory that the source of the currency

3  deposited is illegal, namely that it is proceeds from the sale of untaxed, contraband

4  cigarettes at the ICSS in Puyallup, WA.

5

6                              V. CONCLUSION

7      Title 18, United States Code, Section 2342(a), specifies that no person shall

8  knowingly ship, transport, receive, possess, distribute, or purchase contraband cigarettes.

9      Title 18, United States Code, Section 981(a)(1)(C) provides for the forfeiture of all

10  property(ies) constituting or derived from proceeds traceable to the crime of trafficking in

11  contraband cigarettes, in violation of Title 18, United States Code, Section 2342(a),

12  which is a "specified unlawful activity" under Title 18, United States Code, Section

13  1956(c)(7)(A).

14      Title 49, United States Code, Section 80302(b) specifies that no person shall

15  transport contraband in a vehicle, conceal or possess contraband on a vehicle, or use a

16  vehicle to facilitate the transportation, concealment, receipt, possession, purchase, sale,

17  exchange, or giving away of contraband; specifically, cigarette(s) involved in the

18  violation of Title 18, United States Code, Section 2342(a).

19      Title 49, United States Code, Section 80303 provides for the forfeiture of any

20  vehicle involved in a violation of Title 49, United States Code, Section 80302,

21  transportation of contraband.

22      In addition, Title 31, United States Code, Section 5324(a)(3), specifies that no

23  person shall, for the purpose of evading the reporting requirements set out in Title 31,

24  United States Code, Section 5313, structure or assist in structuring, or attempt to

25  structure, any transaction with a domestic financial institution.  Title 31, United States

26  Code, Section 5313, and related regulations, require any financial institution engaging in

27  a currency transaction with a customer in excess of $10,000 to report the transaction to

28  the Internal Revenue Service on a Currency Transaction Report (CTR), Form 4789.  Title

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 25
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1  31, United States Code, Section 5312(a)(2) defines financial institution to include, inter

2  alia, any credit union.  In addition, Title 31, Code of Federal Regulations, Section

3  103.11(gg) specifies that structuring occurs when a person

4      conducts or attempts to conduct one or more transactions in currency, in any
       amount, at one or more financial institutions, on one or more days, in any manner,
5      for the purpose of evading the reporting requirements.

6  Title 31, Code of Federal Regulations, Section 103.11(gg) further defines the term "in any

7  manner" to be the "breaking down of a single sum of currency exceeding $10,000 into

8  smaller sums, including sums at or below $10,000, or the conduct of a transaction, or

9  series of currency transactions, including transactions at or below $10,000."  Moreover,

10 Title 31, Code of Federal Regulations, Section 103.11(gg) specifies that transactions need

11 not exceed the $10,000 reporting threshold at any single financial institution on any single

12 day in order to constitute structuring.

13     Title 31, United States Code, Section 5317(c)(2) provides in relevant part for the

14 forfeiture of any property involved in violations of Title 31, United States Code, Section

15 5324, or any conspiracy to commit any such violation, or any property traceable to any

16 such violation or conspiracy, and specifies that any such property may be seized and

17 forfeited to the United States in accordance with Title 18, United States Code, Section

18 981(a)(1).

19     As set forth above, there is probable cause to believe that the above-named

20 property(ies) constitute or are derived from proceeds traceable to the crime of trafficking

21 in contraband cigarettes, in violation of Title 18, United States Code, Section 2342(a);

22 vehicle(s) involved in the violation of transportation of contraband, in violation of Title

23 49, United States Code, Section 80302(b); and/or property(ies) involved in structured

24 transactions in violation of Title 31, United States Code, Section 5324(a)(3), or

25 property(ies) traceable to such violation, and are therefore is subject to seizure by, and

26 forfeiture to, the United States, pursuant to Title 18, United States Code, Section

27 981(a)(1)(C); Title 49, United States Code, Section 80303; Title 31, United States Code,

28 Section 5317(c)(2); and, Title 18, United States Code, Section 981(a)(1), respectively.

AFFIDAVIT OF J. MARK KELLER IN SUPPORT OF SEIZURE WARRANTS – 26
IN RE THE SEIZURE OF ALL FUNDS IN BANK OF AMERICA ACCOUNT #...5210, et al.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1      Authority to issue civil seizure warrants for the above identified property(ies) is

2  found in Title 18, United States Code, Section 981(b)(2) and Title 21, United States

3  Code, Section 881(b).  Authority for issuing seizure warrants in this judicial district for

4  accounts located in other districts is found in Title 18, United States Code, Section

5  981(b)(3), because a civil judicial forfeiture action against the property may be filed in

6  this district under Title 28, United States Code, Section 1355(b).  That statute, in turn

7  provides that a forfeiture action may be brought in the district court for the district in

8  which any of the acts or omissions giving rise to the forfeiture occurred.  Title 28, United

9  States Code, Section 1355(b)(1)(A).

11  Dated this _*18th*_ day of September, 2012.

13                                           

14                      J. Mark Keller

                         Task Force Officer

15                      Bureau of Alcohol, Tobacco, Firearms &
                        Explosives

17  Subscribed and sworn to before me this _*18th*_ day of September, 2012.

19                                       

20                      Karen L. Strombom
                      United States Magistrate Judge



*ATTACHMENT 1*

AO 106 (Rev. 06/09) Application for a Sea... ...arrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>**ICSS Drive Thru, 908 River Road,<br>Puyallup, WA (Pierce County), et al.** | )<br>)<br>)   Case No.  MJ12-5056<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

ICSS Drive Thru, 908 River Road, Puyallup, WA (Pierce County), et al.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B for items to be seized.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § § 2342&2343 | Contraband Cigarettes |
| Title 18 U.S.C. § § 1956&1957 | Money Laundering |
| Title 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Affidavit of J. Mark Keller, Special Deputy United States Marshal.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

J. Mark Keller, Special Deputy United States Marshal
*Printed name and title*

Sworn to before me and signed in my presence.

Date:      09/17/2012

_____
*Judge's signature*

City and state:  Tacoma, Washington

Karen L. Strombom, United States Magistrate Judge
*Printed name and title*

AO 106 (Rev. 06/09) Application for a Sea.   Warrant

# UNITED STATES DISTRICT COURT

### for the

### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  MJ12-5056 |
| 2007 White Chevrolet Box Van Washington license B42758E.  VIN: 1GBJG31U371145187, et al. | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

2007 White Chevrolet Box Van Washington license B42758E.  VIN: 1GBJG31U371145187, et al.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

Please see Attachment B for items to be seized.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § § 2342&2343 | Contraband Cigarettes |
| Title 18 U.S.C. § § 1956&1957 | Money Laundering |
| Title 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Affidavit of J. Mark Keller, Special Deputy United States Marshal.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

J. Mark Keller, Special Deputy United States Marshal
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 09/17/2012 _____

_____
*Judge's signature*

City and state:  Tacoma, Washington

Karen L. Strombom, United States Magistrate Judge
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# A F F I D A V I T

STATE OF WASHINGTON     )
)     ss
COUNTY OF PIERCE     )

    I, J. MARK KELLER being first duly sworn on oath, deposes and says:

## I.    Identity of Affiant

    1.    I am a Lieutenant with the Washington State Liquor Control Board (WSLCB) who has been deputized as a Special Deputy United States Marshal, and who is assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, as a Task Force Officer (TFO) in the Yakima Field Office (and have been so assigned with the exception of two months since December 2003). I have been employed by the Washington State Liquor Control Board for 20 years.

    2.    I am familiar with and have received training regarding state and federal laws relating to the possession, distribution, transportation, delivery and sale of cigarettes. This includes those pertaining to the trafficking of contraband cigarettes. As discussed in more detail below, contraband cigarettes generally means packages of cigarettes upon which applicable taxes have not been paid as evidenced by the absence of a valid tax stamp on the cigarette package.

    3.    I have been directly involved in the investigation described in this affidavit regarding contraband cigarette trafficking and other offenses. Other officers and agents from a variety of agencies have also been involved including the ATF, the Internal Revenue Service (IRS), the WSLCB and the Quinault Nation Narcotics Enforcement Team (QNNET).

    4.    The information in this affidavit is based upon my personal observations, as well as the observations and information provided to me by other agents and officers

1    involved in this investigation from the agencies referenced above.  In addition to this

2    information, I have also reviewed and relied upon information provided by the Federal

3    Way (Washington) Police Department, the Post Falls (Idaho) Police Department and the

4    Washington State Patrol.

5          5.      Because this affidavit is submitted for the limited purpose of obtaining the

6    search warrants referenced herein, I have not included all details of every aspect of this

7    investigation, but have set forth only those facts I believe are necessary to establish

8    probable cause for the issuance of the search warrants.

9                     **II.      Overview and Purpose of Affidavit**

10         6.      Various members of the extended Comenout family own and operate the

11   Indian Country Variety Store, a/k/a Indian Country Smoke Shop, a/k/a Indian County

12   Store (ICSS) located at 908 River Road in Puyallup, Washington.  ICSS sells cigarettes to

13   the general public at both the main store, as well as at a drive thru trailer located on the

14   property.[1]  These cigarettes are contraband:  The applicable Washington state taxes have

15   not been paid on the cigarettes as evidenced by the absence of a valid tax stamp on the

16   cigarette packages.

17         7.      The ICSS main store and drive thru are operated by different factions of the

18   Comenout family and their respective associates.  Despite the fact that they operate the

19   main store and the drive thru separately, the sources of the untaxed and contraband

20   cigarettes are the same:  Nick Matheson and his businesses in Northern Idaho on the

21   Coeur d'Alene Indian Reservation and Milton, Washington, on the Puyallup Reservation.

22   King Mountain Tobacco, Inc., located on the Yakama Reservation in Yakima County,

23   Washington, also supplies cigarettes to the main store and drive thru.

24         8.      Nick Matheson lives in Worley, Idaho, and owns Fightin' Creek Smoke

25   Shop, located nearby.  Members of the Comenout family travel every week to

26

27   _____

28        [1]  Unless otherwise specified, the term ICSS when used throughout this affidavit refers broadly to
     both the main store and the drive thru business located in the detached trailer.

Affidavit of J. Mark Keller
Page 2

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1  Matheson's property in Idaho to procure cigarettes for the main store at ICSS.

2  Washington state cigarette taxes are not paid on these cigarettes.

3       9.     Nick Matheson also owns Baby Zack's Smoke Shop in Milton,

4  Washington.  Members of the Comenout family and associates also regularly travel to

5  Baby Zack's to pick up cigarettes for both the main store and drive thru.  Washington

6  state cigarette taxes are not paid on these cigarettes.

7       10.    The final source of the contraband cigarettes sold at ICSS is King Mountain

8  Tobacco, Inc.  King Mountain transports untaxed and contraband cigarettes every week

9  to ICSS, where it delivers to both the main store and the drive thru.

10       11.    The delivery, possession and sale of these contraband cigarettes violates the

11  Contraband Cigarette Trafficking Act (CCTA), 18 U.S.C. §2341 et seq., as well as 18

12  U.S.C. §§ 1956 & 1957 (Money Laundering), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. §

13  2 (Aiding and Abetting).

14       12.    This affidavit is submitted pursuant to Rule 41, Federal Rules of Criminal

15  Procedure, in support of an application for warrants to search both the main store and the

16  drive thru at ICSS, the residences of the two persons believed to be primarily responsible

17  for the operation of the ICSS main store and drive thru, respectively, and several vehicles

18  in order to seize evidence relating to violations of the above-referenced statutes.

19  Specifically, the warrants seek authorization to search the following four locations in the

20  Western District of Washington, as well as the following vehicles that may be found in

21  the Western District of Washington[2]:

22      a.     Main store of ICSS, 908 River Road, Puyallup, Washington
         (Pierce County);

23      b.     ICSS drive-thru, 908 River Road, Puyallup, Washington (Pierce County);

24      c.     Residence of Robert Comenout Sr., 908 River Road, Puyallup, Washington
         (Pierce County);

25

26

---

27     [2] Simultaneously with this affidavit and the warrants sought herein, warrants are also being
sought in the District of Idaho for various locations in that jurisdiction associated with Nick Matheson,

28  including his residence, his businesses and the outbuilding located near his residence from which the
Comenouts pick up cigarettes.

Affidavit of J. Mark Keller
Page 3

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

d.    Residence of Dennis Harris Jr. and Dawn N. Howe, 20812 Church Lake Drive East, Bonney Lake, Washington (Pierce County);

e.    2007 White Chevrolet Box Van Washington license B42758E.  VIN: 1GBJG31U371145187.  Registered to Ed A. Comenout (deceased);

f.    2008 White Chevrolet Silverado Pickup with canopy Washington license B43062E. VIN: 1GCHK24K28E109739 Registered to Robert R. Comenout, Sr.;

g.    2008 White Dodge Ram Pickup with a cube box on the back. Yakima Tribe license # 383.  VIN: 3D6WG46A47G737389 registered to Delbert Wheeler, P.O. Box 237, White Swan, WA 98952; and

h.    2009 Silver Dodge Ram Pickup with a cube box on the back. Yakima Tribe license # 381.  VIN 3D6WH46A58G112787 registered to Trina Wheeler, P.O. Box 237, White Swan, WA 98952.

A full description of the premises and vehicles to be searched is set forth in Attachment A hereto.

13.    The warrants seek authorization to search for and seize the following evidence related to violations of the above-referenced statutes including:  1) contraband cigarettes; 2) records, documents, papers, memoranda, and data; and 3) proceeds related to all distribution and sales of contraband cigarettes.  A complete description of the evidence to be seized is set forth in Attachment B.

### III.    Organization of Affidavit

14.    Given the extensive nature of the investigation in this matter, the number of persons involved and the number of locations sought to be searched, the remainder of the affidavit is organized as follows:

IV. Relevant Statutes and Regulations ......................................................................5
    A.    The Contraband Cigarette Trafficking Act (CCTA):  Title 18, United States Code, Section 2341 et seq. ................................................5
    B.    Other Relevant Federal Statutes ................................................6
    C.    Washington State Laws Regarding Cigarette Taxes ......................7

V.    General Description of Contraband Cigarette Trafficking and Evidence of Such Trafficking Seized in Previous Cases..........................................................9

VI.    Contraband Cigarette Trafficking Through the ICSS....................................13

Affidavit of J. Mark Keller
Page 4

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

A.  General Description of ICSS ................................................................13
B.  The Comenout Family and Associates .................................................14
C.  Initiation of Investigation Into ICSS and Subsequent Purchases of Contraband Cigarettes From ICSS. ......................................................17
D.  Supply of Cigarettes to the ICSS Main Store: From Nick Matheson's Property in Worley, Idaho ....................................................................21
E.  Supply of Cigarettes to the ICSS Main Store and Drive Thru From Nick Matheson's Baby Zack's Smoke Shop. ........................................27
F.  King Mountain Tobacco Deliveries to ICSS Main Store and Drive Thru ..30
G.  Dennis Harris:  Operation and Management of the Drive Thru at ICSS.....32
H.  Summary of Approximate Numbers of Cigarettes Trafficked Through ICSS ......................................................................................................34

VII.  Nick Matheson and His Involvement in Cigarette Trafficking ....................36

VIII.  Locations to Be Searched and Summary of Probable Cause For Those Searches .............................................................................................38

IX.  Records Related to Contraband Cigarette Trafficking and Related Offenses ..............................................................................................40

X.  Evidence To Be Seized .........................................................................41

A.  Computer Evidence...............................................................................41

XI.  Conclusion .............................................................................................51

## IV.  Relevant Statutes and Regulations

A.  <u>The Contraband Cigarette Trafficking Act (CCTA):  Title 18, United States Code, Section 2341 et seq.</u>

15.  "Contraband cigarettes" are defined in 18 U.S.C. § 2341 as:

   a)  A quantity "in excess of 10,000 cigarettes"[3];

   b)  That "bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes";  and

   c)  That "are in the possession of any person" who:

---

[3] Cigarettes are typically packaged as follows:  20 cigarettes in an individual pack; 10 packs in a carton (which contains 200 individual cigarettes); 50 or 60 cartons in a case (which contains 10,000 or 12,000 individual cigarettes).  Thus, the threshold for triggering application of the CCTA is as little as one case of cigarettes.

Affidavit of J. Mark Keller
Page 5

i)  Does not hold a permit issued pursuant to Internal Revenue Service regulations as a manufacturer of tobacco products or as an export warehouse proprietor;

ii)  Does not operate a customs bonded warehouse pursuant to the Tariff Act of 1930 nor is an agent of such a person;

iii)  Is not a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill stating the quantity, source, and destination of such cigarettes;

iv)  Is not licensed or otherwise authorized by the State where the cigarettes are found to account for and pay cigarette taxes imposed by such State, or who has failed to comply with the accounting and payment requirements relating to such license or authorization with respect to the cigarettes involved; or

v)  Is not an officer, employee or other agent of the United States or a State, or any department, agency or instrumentality of the United States or a State having possession of such cigarettes in connection with the performance of official duties.

16.   It is "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes. . . ." 18 U.S.C. § 2342.

B.   Other Relevant Federal Statutes

17.   Conspiracy (18 U.S.C § 371): Two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

18.   Aiding & Abetting (18 U.S.C. § 2): Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, or whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.

19.   Money Laundering (18 U.S.C. §§ 1956-1957): These sections prohibit various financial or monetary transactions involving the proceeds of "specified unlawful activity." Section 1956(c)(7) defines "specified unlawful activity" to include activities listed in 18 U.S.C. § 1961(1), which includes violations of 18 U.S.C. §§ 2341-2346,

Affidavit of J. Mark Keller
Page 6

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

trafficking in contraband cigarettes.  Under 18 U.S.C. § 981(a)(1)(c), all such proceeds are subject to seizure and forfeiture to the United States.

C.    Washington State Laws Regarding Cigarette Taxes

20.    The state of Washington imposes an excise tax on all cigarettes sold, handled, possessed or distributed within its borders. RCW 82.24.020.  Washington collects this tax through the sale of cigarette tax stamps, which must be affixed to cigarette packages by licensed wholesalers before the cigarettes are sold, offered for sale, used, consumed, handled, removed or otherwise distributed.  RCW 82.24.030(1), (2).

21.    RCW 82.24.250(7) provides that the only persons or entities who are authorized to possess unstamped cigarettes under Washington state law are limited to:

a.    Licensed wholesalers;
b.    The United States or an agency thereof; or
c.    Any person, including an "Indian tribal organization," or buyer or consignee of unstamped cigarettes, who
   1)    Has pre-notified the WSLCB of the importation into Washington of the unstamped cigarettes; and
   2)    Has, within the required period of time after the importation of the unstamped cigarettes, caused the cigarettes to be stamped or otherwise made payment of the tax required by law in the manner required by Chapter 82.24 RCW.

22.    Pursuant to RCW 82.24.010(3), "Indian tribal organization" means a:
a.    Federally recognized Indian tribe;
b.    Tribal entity; or
c.    Indian wholesaler or retailer owned by an enrolled tribal member conducting business under tribal license or similar tribal approval within Indian country.

23.    Licensed cigarette retailers in Washington may obtain cigarettes only from a licensed wholesaler. RCW 82.24.050.  Finally, no person can engage in the business of buying, selling, consigning or distributing cigarettes without a license.  RCW 82.24.500.

24.    The State of Washington is authorized to enter into agreements with Indian tribes located in the state regarding the taxation of cigarettes.  RCW 43.06.450.  The terms of any such compacts take precedence over any conflicting provision of RCW 82.24 et seq.  *See e.g.*, RCW 82.24.020(5), .030(5).

Affidavit of J. Mark Keller
Page 7

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

25.     The ICSS operates on land held in trust by the United States for a member of the Quinault Nation.  The State of Washington has entered into a cigarette compact with the Quinault Nation, which has been in effect since 2006.  This compact provides that the Quinault Nation will require any smoke shop located on tribal trust land to comply with the terms of the compact.  This includes the requirement that the smoke shop obtain a license from the Quinault Nation to sell cigarettes.  The compact further provides that the Nation will impose its own cigarette tax equal in amount to the Washington state tax and will track this through the use of tribal stamps affixed to the packages of cigarettes sold by tribally licensed retailers.

26.     Importantly for the purposes of this Affidavit, the Quinault Nation's tobacco ordinances provide that tribal licenses to sell cigarettes will only be issued to wholly-owned tribal enterprises.  Such licenses will not be issued to individual tribal members.

27.     Indian tribal members are entitled to buy tax-free, exempt-stamped cigarettes in Indian country, including trust land, within the State of Washington.  WAC 458-20-186(102)(c)(i).  However, to limit abuse of this right, and to attempt to ensure that only eligible Indians take advantage of this tax exemption, Washington limits the quantity of untaxed cigarettes that may be delivered to the reservations.  WAC 458-20-192(9)(a).     This quantity is determined by the "probable demand of qualified purchasers."  *Id.*  Probable demand is calculated either on the basis of statistical evidence of tribal demand submitted by vendors or, if no such evidence is submitted, by multiplying the tribal population by the national average cigarette consumption per capita.  *Id.*  Thus, Washington law requires that cigarettes destined for sale to tribal members must be pre-authorized by the Department of Revenue, and must bear a Washington State tax exempt stamp.[4]

---

[4] This exception to the requirement of a state or tribal tax stamp does not apply to the cigarette sales at ICSS because, although ICSS is located on Quinault Nation trust land, the Quinault Nation has a cigarette compact with the State.  In addition, the Department of Revenue has not pre-authorized the shipment to ICSS of such tax exempt stamped cigarettes.

Affidavit of J. Mark Keller
Page 8

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

**V.    General Description of Contraband Cigarette Trafficking and Evidence of Such Trafficking Seized in Previous Cases.**

28.    I have been involved in numerous investigations of contraband cigarette trafficking dating back to 1998.   Many of these investigations involved businesses located in Indian country.  In these prior investigations, I or members of the task forces of which I was a part (and whose records I had access to and reviewed) reviewed telephone and financial records, interviewed employees of the businesses and other relevant witnesses, participated in undercover purchases of contraband cigarettes and served and executed search and seizure warrants.   Through these experiences, I have developed an understanding of the manner in which contraband cigarette trafficking occurs and the evidence that is generated in the course of those illegal activities.

29.    Through my training and experience in contraband cigarette investigations, I know that, except for businesses on United States Military bases, generally all other businesses in the State of Washington that sell cigarettes to non-tribal members are required to have a Washington tax paid stamp affixed to every pack of cigarettes.[5]  This requirement also applies to Indian smoke shop owners on tribal lands, who must have an inventory of Washington tax-paid stamped product in order to lawfully sell cigarettes to non-tribal members, unless they operate under the authority of, and in compliance with, the terms of an existing tax contract between the State of Washington and their tribe.  In that case, cigarettes sold to non-tribal members or the general public must bear authorized tribal tax stamps in lieu of Washington State tax stamps.

30.    Most cigarettes are found in packages containing 20 cigarettes.  There are usually 10 packages of cigarettes in a carton, and 50 or 60 cartons in a case.   Cigarette manufacturers ship their product to many different states and jurisdictions.  As a result, the manufacturer almost never stamps the cigarette packages.  In addition, the cases in

---

[5] Currently, the Washington State tax rate for cigarettes is $30.25 per carton.  Prior to May 1, 2010, the tax rate was $20.25 per carton, and prior to July 1, 2005, the tax was $14.25 per carton.  The tax is the same per carton of 200 cigarettes no matter the brand of cigarettes or their cost.

Affidavit of J. Mark Keller
Page 9

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1 which the cartons of cigarettes are shipped are distinctively shaped – long and rectangular
2 - to facilitate the stamping process.  This shape permits the case to be cut in half to
3 expose the cartons for efficient stamping of the cigarette packages inside them.  This
4 information regarding the packaging and stamping of cigarettes demonstrates that a full
5 case of cigarettes usually means the cigarettes inside have not been stamped, while a half-
6 case is evidence that the cigarettes inside may have been stamped.

7     31.    Some retail cigarette businesses in Washington, including smoke shops
8 located on Indian reservations/trust lands, unlawfully sell cigarettes to non-tribal
9 members that do not bear either a Washington State tax-paid stamp or a valid tribal tax
10 stamp.  These businesses have up to a $30.25 per carton advantage (the current state tax
11 rate) over all retail cigarette businesses in Washington who comply with the state's
12 taxation requirements.[6]

13     32.    The failure to pay the applicable Washington State tax by those who traffic
14 in contraband cigarettes causes the State to lose millions of dollars in tax revenue to
15 which it is lawfully entitled, and may result in tax increases in other areas, adversely
16 affecting taxpayers.  Further, this loss of revenue may inhibit the State's ability to fund
17 projects and improvements in areas such as education, public works, and health
18 care.  Moreover, the sale of contraband cigarettes unfairly curbs the ability of lawfully
19 operating retail establishments to compete for customers in an open market.  This creates
20 an "unfair" playing field for businesses that penalizes those who abide by federal and
21 state laws.  Finally, the profits made by both the retailers and complicit suppliers of
22 contraband cigarettes, which result from this unfair economic advantage, constitute
23 proceeds of specified unlawful activity as defined in the federal anti-money laundering
24 statutes, and accordingly are subject to seizure and forfeiture under existing federal law.

25     33.    I am aware that there are approximately 29 federally recognized Indian
26 tribes in the state of Washington.  Many of these Indian tribes have reservations and trust

---

[6] All compact tribes except the Puyallup are required to set their tribal cigarette tax at the same rate as the state
cigarette tax.  RCW 43.06.460(1).

Affidavit of J. Mark Keller
Page 10

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1   lands located in or near large population areas such as Seattle, Tacoma, Olympia, Everett,
2   Spokane and Yakima.  During these investigations, I have learned that employees and/or
3   owners of some smoke shops on Indian reservations and trust lands in Washington will
4   travel to Indian reservations in Idaho, most notably to the Coeur d'Alene and Nez Perce
5   Reservations, to acquire large volumes of cigarettes.  Both of these reservations are close
6   to the border of Washington and can be accessed through a variety of roads.

7        34.      These cigarette investigations have revealed that the reason Washington
8   Indian cigarette retailers travel to Idaho to purchase cigarettes is that Washington requires
9   Indian smoke shops to collect cigarette taxes on all sales to non-tribal members, currently
10   at a rate of $30.25 per carton.  Idaho does not require Indian smoke shops to collect taxes
11   on sales to non-tribal members.  Thus a smoke shop owner in Washington can drive to
12   Idaho and purchase as many cigarettes as they want as long as the Idaho Indian cigarette
13   retailer/wholesaler agrees to the transaction.  The enforcement actions by the United
14   States Government over the past several years have led to some Idaho Indian cigarette
15   retailers/wholesalers being convicted of conspiracy, trafficking in contraband cigarettes,
16   RICO, and money laundering violations.  The government was able to show the
17   cigarettes were smuggled or "bootlegged" from Idaho to Washington.

18        35.      Based on my experience, I have learned that once the cigarettes are
19   smuggled into Washington and are offered for sale, the price is slightly below what the
20   price would be at a legitimate retailer who has legally stamped cigarettes for
21   sale.  However, the slight price difference is often sufficient to attract customers from
22   long distances away and these Indian smoke shops vastly outsell other non-Indian
23   cigarette retailers and wholesalers creating tremendous profits.

24        36.      I am aware from my prior experiences in contraband cigarette trafficking
25   cases that evidence of such trafficking in the form of records, proceeds and contraband
26   cigarettes is kept and can be found in the residences of those that participate in such
27   trafficking, as well as the businesses and locations from which the cigarettes are sold.  It
28   is also likely that computers and digital devices are being used to facilitate the contraband

Affidavit of J. Mark Keller
Page 11

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1   cigarette trafficking and related offenses.  I expect that the digital devices likely contain

2   evidence of the aforementioned offenses, including but not limited to purchase orders and

3   inventory, records relating to the source of the contraband cigarettes, and records related

4   to the payment and location of money related to the contraband cigarette trafficking.  All

5   of the foregoing is supported by my experience and that of my fellow agents and officers

6   in other contraband cigarette trafficking cases.  Specifically, in these other cases, agents

7   and officers found digital devices to have been used to facilitate contraband cigarette

8   trafficking and found evidence of such trafficking on digital devices.  These devices have

9   been found in both businesses selling contraband cigarettes, as well as in the residences

10  of those persons managing and operating the businesses.  Search warrants in prior

11  investigations have resulted in the seizure of currency and proceeds from such places as

12  dresser drawers in a master bedroom, attics, and safes in the business.  In fact, currency

13  seized in these previous investigations totaled over $2.8 million and $1.5 million from

14  residences and business locations, respectively.  Records seized from residences in these

15  previous investigations have included bank statements, telephone records, invoices and

16  receipts.   Records seized from the business locations have included bank records,

17  purchase invoices, sales journals, fax cover sheets and correspondence.

18      37.    Through these investigations, I have learned that when search warrants or

19  seizure warrants are executed on smoke shops, word travels quickly among the Indian

20  smoke shop owners.  Many smoke shop owners are now reluctant to use banks as a result

21  of the seizure of bank accounts.  As a result of law enforcement actions, many of the

22  suppliers of cigarettes to Washington smoke shop owners demand full payment for the

23  cigarettes before they will let the Washington smoke shop owners take possession of the

24  cigarettes.  These suppliers are aware that once the cigarettes arrive in Washington, they

25  are subject to seizure.  I am aware of several instances in other cigarette investigations

26  where up to a quarter million dollars in cash has been transported to Idaho Indian smoke

27  shops to purchase cigarettes.

28

Affidavit of J. Mark Keller
Page 12

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

## VI.   Contraband Cigarette Trafficking Through the ICSS

A.   General Description of ICSS

38.    ICSS is located on a busy road (River Road) that connects Interstate 5 to Puyallup and Auburn, Washington.  It is located on land that is held in trust by the United States Government for certain members of the Quinault Nation.  The actual Quinault Indian Reservation is located on the coast north of Aberdeen, Washington, approximately 120 miles to the west of ICSS.

39.    The property on which ICSS is located contains a main building and a trailer that is detached from the main building and sits on the edge of the property closest to River Road.  A diagram depicting this is found in Attachment A.[7]

40.    The main building is primarily a one story building.  The middle section and the west end sections of building extend upwards to two stories.  From the east to west end of the main building are the following:  1) a storeroom into which I have observed cigarettes being taken; 2) the main store (which extends into the bottom floor of the two story section of the building); and 3) residence.

41.    ICSS mainly sells cigarettes but also sells other tobacco products (OTP), as well as candy, soft drinks, and Native American crafts at the main building in the complex.  It is believed that only cigarettes are sold at the drive thru building.

42.    ICSS is not licensed by the State of Washington as a cigarette wholesaler or retailer.

43.    ICSS is not licensed by the Quinault Nation under the terms of the Nation's cigarette compact with Washington.  Robert Comenout, Sr., who, as described below, owns and operates the main store at ICSS (see ¶ 49) recently applied in May 2012 to the Quinault Nation for a business license for ICSS and indicated on the application that ICSS sells "cigarette [sic], tobacco products, and Indian crafts."  This business license was subsequently issued to "Robert Comenout Sr./Indian Country Store" and signed by a Quinault tribal official on July 10, 2012.  However, this is not a cigarette license within

---

[7] There also appears to be a used car sales business on the ICSS property.

Affidavit of J. Mark Keller
Page 13

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1   the meaning of the cigarette compact between the State of Washington and the Quinault

2   Nation for the simple reason that the Nation's ordinances provide that only entities

3   wholly owned by the Nation, not individual tribal members, are authorized to sell

4   cigarettes on Quinault tribal land, including trust land.[8]  See ¶ 26.

5       44.   Because ICSS is not licensed by the State of Washington or the Quinault

6   Nation, and because it is not stamping the cigarettes sold before their sale, it does not fall

7   within the definition of a "person authorized by this chapter to possess unstamped

8   cigarettes" as provided in RCW 82.24.250(7).  As such, any cigarettes that do not have a

9   valid Washington state tax-paid stamp that are delivered to, found at and sold through

10  ICSS are contraband under RCW 82.24.250(4).

11  B.   The Comenout Family and Associates

12      45.   The Comenout family has been selling cigarettes at ICSS for many years.

13  *See e.g., Matheson v. Kinnear*, 393 F. Supp. 1025 (W.D.Wash. 1974) (describing how

14  Edward Comenout and David Matheson operated in the early 1970s a retail business

15  selling untaxed cigarettes at 908 River Road, the location of ICSS).  Attached hereto as

16  Attachment C is a genealogical chart depicting the Comenout family and what I

17  understand are the various ownership interests family members held and currently hold in

18  ICSS.  This attachment and the information contained in this affidavit regarding the

19  relationship between the various family members and their ownership interests in ICSS

20  has been derived from probate records, other courts documents detailing business

21  disputes between the family members and obituary notices published in local newspapers.

22      46.   Edward Comenout, Sr.:  Owned the land on which ICSS is now located.

23  When he died, half of his ownership interest passed to his wife, Anna, and the other half

24  passed to his son, Edward Comenout, Jr.

---

25  [8] The Quinault Nation has sued numerous members of the Comenout family in federal district court, alleging that
26  their continued sale of contraband cigarettes constitutes racketeering in violation of 18 U.S.C. § 1961 et seq.
    *Quinault Indian Nation v. Comenout et al.*, C10-5345BHS (W.D.Wash.).  In that proceeding, the Comenout
27  defendants have taken the position in documents filed with the Court that the Nation's laws pertaining to cigarettes,
    including its licensure requirement, do not apply to ICSS or the Comenouts' activities there because the tribal code
28  applies only within the boundaries of the Quinault reservation and does not apply to the trust land upon which ICSS
    operates.

Affidavit of J. Mark Keller
Page 14

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

47.   <u>Anna Comenout Harris</u>:  Wife of Edward Comenout, Sr.  After his death, she married a man whose last name was Harris.  She had at least two children with Edward, Sr. (Edward, Jr. and Robert Comenout, Sr.) and had several children with Mr. Harris (Dorothy, Donald, Diane, Dennis, and Duane).  When Anna died in 1987, her half-interest in ICSS was divided into nine shares.  Eight of these shares went to her children and the last share was split into three separate parts, as shown in Attachment C.

48.   <u>Edward Comenout, Jr.</u>:  Edward Jr. owned a majority interest in ICSS when he died in June 2010.  He never married and had no children.  At the time of his death, his ownership interest was divided into fifths and passed as shown in Attachment C. Three of the five shares went to members of the Gardee family, who appear to be Edward Jr.'s grandnephews.

49.   <u>Robert Comenout, Sr.</u>:  Brother of Edward Jr. and son of Anna Comenout, through whom he obtained an ownership interest in ICSS.  After Edward Jr.'s death in June 2010, Robert Sr. signed in March 2012 and filed with the Quinault Nation Tribal Court a Petition for Probate and Appointment of Administrator.  This document states that Robert Sr. was the "business partner" of Edward Jr. "in the family-owned business, Indian Country Store. . . ."  Robert Sr. also lists the ICSS property as his address.  The petition indicates that shortly before the death of Edward Jr., he and Robert Sr. agreed that Robert Sr. would "assume responsibility for the day-to-day management and control of the family business, *i.e.*, the Indian Country Store, as the elder of the family."  Finally, the petition indicates that Robert Sr. would share daily sales, expenses and profits with the Gardee family members who inherited some of Edward Jr.'s ownership interest.

50.   <u>Lee Comenout, Sr.</u>:  As described in more detail below, Lee Sr. regularly drives the truck used to transport cigarettes from Nick Matheson's property in Idaho to the main store at ICSS.  He is also the father of Lee Jr., Anna and Errol Comenout.  Lee Sr. is believed to be an enrolled member of the Yakama Nation.[9]

---

[9] Yakama tribal members have a treaty right to travel on public highways to take goods to market free from government restrictions.  *United States v. Smiskin*, 487 F.3d 1260, 1265 (9th Cir. 2007).  As such, Yakama tribal members cannot be prosecuted for a substantive violation of the CCTA that is centered on the transport of cigarettes.

Affidavit of J. Mark Keller
Page 15

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

51.   Martina Garrison:   Martina is the daughter of Dorothy Harris Steward. Martina inherited a substantial ownership in ICSS through Dorothy and through a share willed to her by Edward Comenout, Jr.

52.   George William Gardee:   According to the above-referenced Probate Petition, George is a distributee and heir of Edward Jr.'s will.   According to that Petition, George is one of the Gardees who would share in the business at ICSS.   As described in more detail below, George has been involved in the business at ICSS for many years and was found by WSP in 2005 to have been transporting over 240 cartons of unstamped cigarettes from Nick Matheson's Fightin' Creek business in Idaho to ICSS.

53.   Dennis Harris, Jr.[10]:   Dennis is the son of Dennis "Jack" Harris, and the grandson of Anna Comenout Harris.   He is believed to have inherited his father's interest in ICSS.   As described in more detail below, Dennis has been and remains involved in operating the drive thru at ICSS.

54.   Jeremy Propst[11]:   Unlike the Comenouts, Harrises, Garrisons and Gardees discussed above, Jeremy does not appear to be an enrolled member of any federally recognized Indian tribe, nor does he appear to be related to the extended Comenout family.   Despite this, the above-referenced Petition for Probate states that Jeremy Probst operates the drive-thru cigarette business at ICSS.   According to the Petition, although

---

Id. (involving CCTA prosecution for violation of Washington state law requirement that certain shippers of unstamped cigarettes pre-notify state authorities prior to transporting such cigarettes within the state).   However, even though Yakama tribal members may not be prosecuted for certain substantive CCTA violations, they may be prosecuted for conspiracy to commit racketeering violations predicated on substantive CCTA violations where other participants in the conspiracy or racketeering organization are not Yakama tribal members, as is the case in this matter.   United States v. Fiander, 547 F.3d 1036, 1040-42 (9th Cir. 2008).   In addition, unstamped cigarettes transported by a Yakama tribal member who does not have a wholesaler's license or is not otherwise permitted to possess unstamped cigarettes remain contraband even if the tribal member cannot be prosecuted for substantive CCTA violations for the transportation.   Smiskin, 487 F.3d at 1263 (unstamped cigarettes themselves contraband even though Yakama tribal members may not be prosecuted for transporting those cigarettes).

[10] Harris is referred to in this affidavit as Harris, Jr. and Harris.   This is the same person.

[11] Jeremy Propst's last name is sometimes spelled in various records as Probst.   It is believed, however, that this refers to the same person.

---

Affidavit of J. Mark Keller
Page 16

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1  Robert Sr. and other family members have asked Jeremy and his partners in the drive-
2  thru to vacate and leave the drive thru, those persons have refused to do so.

3      55.    None of the persons described above in paragraphs 48 through 54, nor the
4  business known as ICSS, are authorized to possess unstamped and untaxed cigarettes
5  under Federal or State law.  The Contraband Cigarette Trafficking Act provides that in a
6  state such as Washington that requires tax stamps to be affixed to cigarette packages,
7  unstamped cigarettes can be possessed only by a person or entity meeting one of the
8  narrow criteria detailed above at ¶ 15(c).  The aforementioned persons and ICSS do not
9  satisfy these criteria.  In particular, none of these persons nor ICSS are authorized under
10  Washington state law to possess unstamped and untaxed cigarettes (¶ 15(c)(iv)).  They
11  are not state licensed wholesalers and do not otherwise satisfy the criteria detailed above
12  in ¶ 21.  Nor are they licensed by the Quinault Nation under the terms of the Nation's
13  cigarette compact with Washington.[12]

14  C.    Initiation of Investigation Into ICSS and Subsequent Purchases of Contraband
15        Cigarettes From ICSS.

16      56.    As noted above at ¶ 45, disputes about the sale of untaxed cigarettes at
17  ICSS date back to at least the early 1970s.

18      57.    In July 2008, the WSLCB obtained a warrant in Pierce County Superior
19  Court to search ICSS based on its sale of untaxed contraband cigarettes.  The warrant was
20  executed on July 25, 2008, and WSLCB agents seized approximately 37,685 cartons of
21  contraband cigarettes along with a small amount of records and two computers.  The
22  records seized included a price list for cigarettes and other tobacco products, receipts,
23  correspondence and bank account records.  Most of the cigarettes were stamped with
24  Idaho Indian reservation stamps, which are not valid in Washington.  Some cigarette
25  packages did not bear any stamps.  No cigarette packages bearing Washington tax stamps
26  were found during this search.

27  _____
28  [12] And they are not eligible for such a tribal license pursuant to Quinault Nation law because ICSS is not a wholly
   owned tribal enterprise.  *See* ¶ 28, above.

Affidavit of J. Mark Keller                          United States Attorney
Page 17                                          700 Stewart Street, Suite 5220
                                                      Seattle, Washington
                                                       (206) 553-7970

58. A large amount of cash was located in a safe in the back room of the main store at ICSS. However, this money was not seized as the WSLCB believed it was beyond the scope of the warrant. Photographs were taken of the cash when it was found. ATF Asset Forfeiture Investigator Darryl Roosendaal has reviewed these photographs and informed me the cash was bundled with double bands, which is similar to the manner in which the cash that was seized from the residence of Dennis Harris and Dawn Howe on May 28, 2011, was bundled (described below at ¶ 106).

59. Despite the execution of the warrant and the seizure of over 37,000 cartons of contraband cigarettes, ICSS has continued to sell untaxed, unstamped contraband cigarettes to the public. In September 2008, less than two months after execution of the warrant, the WSLCB made two more purchases of cigarettes from ICSS. All the cigarette packages that were purchased did not bear a valid Washington State tax stamp.

60. Agents and officers have continued to regularly purchase cigarettes from both the ICSS main store, as well as the drive thru. All of the cigarettes purchased did not bear valid Washington state tax stamps or tribal stamps recognized as valid under Washington state law:

    a. On June 3, 2011, ATF Special Agent (S/A) Boyd Goodpaster purchased one pack of GPC cigarettes for $4.75 and ATF S/A Tom Walsh bought one pack of Marlboro cigarettes for $7.00 from the main store of ICSS. The GPC cigarettes were stamped with only a Coeur d'Alene tribal stamp and the Marlboro cigarettes appeared to have a partial Coeur d'Alene tribal stamp affixed. The Coeur d'Alene tribal stamp is not a valid Washington state tax stamp.[13]

    b. Also on June 3, 2011, ATF S/As Walsh and Goodpaster drove up to the ICSS drive thru and purchased one pack of Marlboro cigarettes for $7.00. This pack was stamped only with a Coeur d'Alene tribal stamp.

    c. On July 8, 2011, S/A Walsh purchased one pack of Marlboro cigarettes from the ICSS drive thru for $7.00. This pack was stamped with a Coeur d'Alene Tribal stamp only.

---

[13] As described in more detail below, Nick Matheson, who lives on the Coeur d'Alene Reservation in Idaho, is the primary supplier of cigarettes to ICSS. Nick Matheson is believed to be licensed by the Coeur d'Alene Tribe to sell cigarettes and therefore he sells cigarettes stamped with a Coeur d'Alene tribal tax stamp.

Affidavit of J. Mark Keller
Page 18

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

d.   On July 21, 2011, S/A Walsh purchased one pack of Marlboro cigarettes for $7.00 and one pack of Native brand cigarettes for $5.00 from the ICSS drive thru.   The Marlboro cigarettes were stamped with only a Coeur d'Alene tribal stamp while the Native brand pack did not bear any stamp.

e.   On July 21, 2011, S/A Walsh purchased one pack of Marlboro cigarettes for $7.00 from the main store of ICSS.   This pack was stamped with only a Coeur d'Alene tribal stamp.

f.   On October 19, 2011, S/A Walsh purchased one pack of Newport cigarettes for $7.00 and one pack of GPC brand cigarettes for $6.00 from the ICSS drive thru.   Both packs were stamped with only Coeur d'Alene tribal stamps.

g.   On October 19, 2011, S/A Walsh purchased one pack of Kool brand cigarettes from the main store of ICSS for $7.00.   This pack of Kool cigarettes was stamped with only a Coeur d'Alene tribal stamp.

h.   On January 5, 2012, ATF S/A Goodpaster and I went to the main store of ICSS.   We each purchased one pack of Marlboro cigarettes for $7.00 a piece.   Both packs were stamped with only Coeur d'Alene tribal stamps.   We both noted the store easily contained more than 50 cartons (10,000 cigarettes plus) of cigarettes.

i.   On January 26, 2012, S/A Walsh purchased one pack of Marlboro cigarettes from the ICSS drive thru for $7.00.   The pack was stamped with only a Coeur d'Alene tribal stamp.

j.   On January 26, 2012, S/A Walsh went into the main store of ICSS and purchased one pack of Marlboro cigarettes for $7.00, one pack of GPC brand cigarettes for $6.00 and one pack of 305's brand of cigarettes for $3.50.   The packs of Marlboro and GPC cigarettes were both stamped with only Coeur d'Alene tribal stamps, while the 305's brand did not bear any stamp.

k.   On February 7, 2012, S/A Goodpaster purchased one pack of Kool cigarettes for $7.00 from the ICSS drive thru.   This pack of cigarettes was stamped with only a Coeur d'Alene tribal stamp.

l.   On March 15, 2012, WSLCB Lt. Al Anderson purchased two packs of Carnival brand cigarettes for $11.00 from the main store.   Both packs were stamped with only Coeur d'Alene tribal stamps.

m.   On March 21, 2012, I purchased one pack of Marlboro cigarettes from the ICSS drive thru for $7.00.   This pack of cigarettes was stamped with only a Coeur d'Alene tribal stamp.

n.   On April 6, 2012, S/A Walsh purchased one pack of Newport cigarettes for $7.00 and one pack of King Mountain cigarettes for $4.75 from the main store at ICSS.   The Newport cigarettes had only

Affidavit of J. Mark Keller
Page 19

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

a Coeur d'Alene tribal stamp while the King Mountain cigarettes had no tax stamp affixed.

o.   Also on April 6, 2012, S/A Walsh purchased one pack of Marlboro cigarettes for $7.00 from the ICSS drive thru.  This pack was stamped with only a Coeur d'Alene tribal stamp.

p.   On April 11, 2012, I purchased two packs of King Mountain cigarettes from the main store at ICSS for $9.50.  Neither pack of cigarettes had a tax stamp affixed.

q.   On May 16, 2012, S/A Walsh purchased one carton of 305's brand cigarettes for $30.00 and one pack of Marlboro cigarettes for $7.00 from the main store at ICSS.  The 305's brand cigarettes had no tax stamps affixed while the Marlboro cigarettes had only a Coeur d'Alene tribal stamp affixed.

r.   Also on May 16, 2012, S/A Walsh purchased one pack of Camel cigarettes from the ICSS drive thru for $7.00.  This pack was also stamped with only a Coeur d'Alene tribal stamp.

s.   On June 14, 2012, Agent Goodpaster purchased one pack of 305's brand cigarettes from the main store at ICSS for $4.00.  It had no tax stamp affixed.

t.   On June 27, 2012, I purchased one pack of 305's brand cigarettes from the ICSS drive thru for $3.50.  This pack had no tax stamp affixed.

u.   On August 1, 2012, I purchased one carton of King Mountain cigarettes for $40 from the main store.  There were no tax stamps affixed on the cigarette packs.

v.   Also on August 1, 2012, I purchased one carton of 305's brand cigarettes for $30 from the drive thru.  There were no tax stamps affixed to these cigarettes.

w.   On August 8, 2012, I purchased one pack of Marlboro cigarettes from the drive thru for $7.00.  It had a Coeur d'Alene tribal tax stamp affixed.  This is not a valid tax stamp in Washington.

x.   On August 29, 2012, WSLCB Officer Raj Veluppillai purchased one pack of Camel cigarettes from the ICSS main store for $7.00.  The pack was stamped with only a Coeur d'Alene tribal stamp.

y.   On the following day, August 30, 2012, WSLCB Officer Veluppillai purchased one pack of King Mountain cigarettes from the ICSS drive thru for $4.75.  The pack had no tax stamp affixed.

z.   On September 10, 2012, WSLCB Officer Veluppillai purchased one pack of Marlboro cigarettes for $7.00 and one pack of King Mountain cigarettes for $4.75 from the ICSS main store.  The Marlboro cigarettes had a Coeur d'Alene tribal stamp affixed while the King Mountain cigarettes had no tax stamp affixed.

Affidavit of J. Mark Keller
Page 20

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

aa.   Also on September 10, 2012, WSLCB Officer Veluppillai purchased one pack of Camel cigarettes for $7.00 and one pack of King Mountain cigarettes for $4.75 from the ICSS drive thru. The Camel cigarettes had a Coeur d'Alene tribal stamp affixed while the King Mountain cigarettes had no tax stamp affixed.

D.   Supply of Cigarettes to the ICSS Main Store: From Nick Matheson's Property in Worley, Idaho

61.   Overview: The main store at ICSS appears to get its cigarettes from three sources. First, Lee Comenout, Sr. and other family members and associates travel to Nick Matheson's property in Worley, Idaho, pick up cigarettes there and then transport those back to the main store. Second, Comenout family members and associates also travel to Nick Matheson's Baby Zack's smoke shop in Milton, Washington, to pick up smaller amounts of cigarettes. Finally, King Mountain Tobacco out of White Swan, Washington, which is on the Yakama Indian Reservation in Yakima County, Washington, delivers cigarettes to the main store every week.

62.   Comenout family members have traveled to Nick Matheson's property in Idaho to obtain cigarettes for the main store at ICSS for many years. For example, George W. Gardee was the passenger in a vehicle stopped by the WSP on May 26, 2005, on I-90 near Ritzville, Washington. Although a passenger, the truck was registered to Gardee. The truck contained 241 cartons of cigarettes. These cigarettes had no valid Washington stamps, only Coeur d'Alene tribal stamps.

63.   After being advised of his *Miranda* rights, Gardee stated he represented the business interest of ICSS. Gardee stated that he was in charge of monitoring and maintaining the cigarette and OTP (other tobacco products) inventory at that business, including obtaining additional product when needed. Gardee stated that he made two to three trips per week to smoke shops located in Idaho to purchase cigarettes and OTP for ICSS. Gardee purchased the cigarettes and OTP from whichever smoke shop had the lowest prices, including Nick Matheson's Fightin' Creek Smoke Shop. Gardee produced receipts showing that the cigarettes located in the vehicle were purchased on that date

Affidavit of J. Mark Keller
Page 21

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

(May 26, 2005) from Fightin' Creek Smoke Shop, located at 23181 S. Hwy 95, Coeur d'Alene, Idaho. Gardee also stated some of the cigarettes in his vehicle were purchased at Adeline's. The WSLCB seized the cigarettes as contraband under state law.

64.    When asked if he was an owner or an employee of ICSS, Gardee responded that he worked for his cousin, Dennis Harris. When asked if Gardee was being paid by Harris or by ICSS, Gardee responded that the business had not yet made any money and he had not received any pay for his efforts to date. Gardee stated he had only worked for ICSS for a month or less, but had been involved in family-owned smoke shops since he was 12 years old. Gardee was 24 years old at the time of this incident.

65.    More recently, Idaho police uncovered Lee Comenout Sr.'s involvement in transporting cigarettes from Idaho. On February 22, 2011, the Post Falls, Idaho, Police Department responded to the Riverbend Inn located in Post Falls regarding a report by hotel staff. Upon arrival, the Post Falls Police Department was notified by hotel staff that the smell of marijuana was coming from room number 152. The police made contact with the occupants of the room: Lee Comenout Sr., and his children, Errol and Anna. After a consent search, the police located a bag of marijuana, a black bag containing $2,500 in cash in $20 denominations, two plastic bags containing prescription pills, and other narcotics use paraphernalia. After being given a *Miranda* warning, Lee Sr. confessed that the marijuana was his. Errol stated the currency was his life savings, but could not explain how he got the currency, or paid for the pills in his possession, as he did not have a job. An additional bag of marijuana was located in Anna's purse. All amounts of narcotics were user quantities. An additional $1,800 was located in the possession of Lee Sr.; all in $100 bills.

66.    The police determined that a white 2007 Chevrolet van with Washington license B42758E parked in the hotel lot belonged to the Comenouts. Lee Sr. stated the vehicle was his work truck. The truck was registered to Ed A. Comenout, 908 River Road, Suite B, Puyallup, Washington (as noted, Ed Jr. died in June 2010, but the vehicle remains registered in his name). Lee Sr. consented to a search of the van and said it was

loaded with cigarettes. Lee Sr. stated he had no problem speaking to the police about his drug use but advised he did not want to talk about the cigarettes. Lee Sr. advised he had an open case going on regarding cigarettes and that he had an attorney for this matter and was not at liberty to discuss it.

67.     The search of the van revealed approximately 5,480 cartons of cigarettes (over 1 million individual cigarettes) at least some of which were believed to be stamped with Coeur d'Alene Indian Reservation stamps. An invoice, which did not bear the name of the seller, was recovered with the cigarettes and stated the cost of the cigarettes to be $119,666. The invoice stated "Sent 108,000.00" and "balance 12,931.00." The date of the invoice was "2 22." Police seized the van and the cigarettes.

68.     The following day, February 23, 2011, the police released the van and the cigarettes back to the Comenouts because those cigarettes were not contraband in Idaho. Officers with the WSLCB placed the van under surveillance when it left Post Falls, Idaho, anticipating that it was destined for ICSS. Instead of the vehicle heading to Washington, it traveled to Matheson's Fightin' Creek Smoke Shop, 23181 South Highway 95, Coeur d'Alene, Idaho, on the Coeur d'Alene Indian Reservation near Worley. Due to severe weather conditions, surveillance of the vehicle was terminated.

69.     The Comenouts and their associates have continued to use the 2007 white Chevrolet box van, Washington license plate number B42758E, to transport cigarettes from Idaho to ICSS. On March 28, 2012, agents and officers investigating this matter obtained a warrant to place an electronic GPS tracking device on the box van, which was subsequently installed. With the exception of approximately one week, the tracker has been active since its installation and has provided electronic data on the location of the van. This electronic data has been augmented with visual surveillance by agents and officers.

70.     The electronic and visual surveillance of the box van reveals a reliable pattern involving the weekly transport of cigarettes from Nick Matheson's property in Idaho to the ICSS main store. The trips to Idaho occur every week, usually on

Affidavit of J. Mark Keller
Page 23

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1 Wednesdays. Lee Sr. appears to be the primary driver of the box van and he is typically

2 accompanied by another person.

3     71.    The box van usually makes two stops in Idaho relative to the violations of

4 law alleged in this affidavit. First, it typically stops at Fightin' Creek Smoke Shop,

5 located at 23181 S. Highway 95, Coeur d'Alene, Idaho, for a short time (less than ten

6 minutes).

7     72.    In addition, the box van also makes a stop at Nick Matheson's property

8 located to the north and west of the intersection of Highway 95 and West Elder Road.

9 This property includes several structures, including Matheson's residence at 13145 West

10 Elder Road and an outbuilding located approximately 200 meters away with the address

11 of 13155 West Elder Road. These locations are less than two miles from Fightin' Creek

12 Smoke Shop. GPS data indicates the box van usually stops at the outbuilding located at

13 13155 West Elder Road and stays there an average of 30 minutes.

14     73.    The vehicle then returns to the Tacoma/Puyallup area late on Wednesday

15 night or very early on Thursday morning. Very early on Thursday mornings, at

16 approximately 4:30 a.m., Lee Sr., sometimes with other family members, drives the box

17 van to ICSS. There, the box van is backed up to a door located on the east end of the

18 ICSS complex. Usually within approximately 20 to 30 minutes, the door opens and

19 several persons appear to unload the van.

20     74.    After the box van is unloaded, Lee Sr. usually walks up a ramp leading to

21 the residence of Robert Sr. located on the ICSS property.

22     75.    Cigarettes are the primary product that is unloaded from the box van and

23 carried into ICSS. Agents and officers have seen numerous varieties of cigarettes

24 unloaded, including Carnival, Misty, Marlboro, Camel and Virginia Slims. These brands

25 are usually seen in half cases, which indicate the packs may have been stamped at some

26 point (see above at ¶ 30). As noted above, undercover buys of cigarettes from ICSS show

27 that many packs purchased had Coeur d'Alene Tribal stamps. ICSS is not known to have

28 a cigarette stamping machine however, as detailed below in ¶ 124, Nick Matheson stated

Affidavit of J. Mark Keller
Page 24

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1    he has a stamping machine at his residence, which he stated was located at 12727 West

2    Elder Road, Worley, Idaho.

3        76.    In addition, agents and officers have also seen full cases of 305's brand of

4    cigarettes unloaded from the box van on Thursday mornings.   These cases of 305's

5    appear to be unopened, which indicates the cigarettes are likely not stamped.  *See* ¶ 30.

6    This is supported by the undercover purchases of 305's from ICSS, none of which had

7    any tax stamps on them.  *See* ¶ 60 (q, s, t, v).

8        77.    The GPS surveillance of the box van reveals that it travelled from

9    Tacoma/Puyallup to Worley, Idaho, following the general weekly pattern described

10   above from April 12, 2012, through August 9, 2012.   The one exception is the second

11   week of May 2012 when the GPS did not provide any data as its battery was low.

12       78.    The weekly pattern described above is confirmed by a check of the Post

13   Falls Police Department cameras, which photograph vehicles entering Idaho on I-90 and

14   traveling on some other roads in the Post Falls/Coeur d'Alene area.   A review of footage

15   from these cameras show that between January 25, 2011, and December 14, 2011, the

16   white 2007 Chevrolet van with Washington license B42758E had passed through the area

17   on 22 separate occasions.  These photos are consistent with travel routes from ICSS to the

18   Coeur d'Alene Indian Reservation.   It should be noted that not all routes of travel to and

19   from Washington into northern Idaho are covered by cameras.

20       79.    Cigarettes are also delivered to the main store using a white 2008 Chevrolet

21   pickup truck with Washington license B43062E.   This vehicle is registered to Robert R.

22   Comenout Sr., 908 River Road, Puyallup, Washington.   The pickup truck has a

23   distinctive canopy over its bed.

24       80.    For example, records indicate that at approximately 8:40 a.m. on

25   Wednesday, February 29, 2012, Lee Comenout, Sr. rented a trailer from U-Haul in Coeur

26   d'Alene, Idaho.

27       81.    Later that day at approximately 7:00 p.m., WSLCB Lieutenant Al

28   Anderson observed the pickup truck, which was towing a two-axle trailer, backed up to

Affidavit of J. Mark Keller
Page 25

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

the east end of the main store at ICSS near the door through which cigarettes from the white box van are usually unloaded. The rear doors to the pickup canopy area were open and Lt. Anderson observed, inside the bed of the pickup truck, brown cardboard boxes resembling the size and shape of boxes that are consistent with the way that cigarettes are packaged. He estimated that the boxes were 36 inches in height, 24 inches wide and 18 inches deep. Based on his training and experience in conducting investigations involving cigarettes over the past 11 years, he believed the boxes' appearance were consistent with the way full cases of cigarettes are regularly packaged. Lt. Anderson observed a male individual unloading the boxes from the pickup truck onto a four-wheel hand cart. The cart, when loaded, appeared to hold four to five boxes. The boxes were then taken into ICSS.

82. Beginning in mid-August 2012, the Comenouts appear to have started using the white pickup, along with a towed trailer, to make the weekly trips to Idaho to pick up the cigarettes from Nick Matheson. The following week, the white pickup was seen in the ICSS parking area hooked to a U-Haul trailer. On Thursday, August 23, 2012, and Thursday, September 6, 2012, agents and officers observed cigarettes being unloaded at the usual early morning time from the white pickup and attached U-Haul trailer into the ICSS main store. Specifically, agents and officers saw approximately 91 full and 37 half cases of cigarettes unloaded into the main store on August 23, 2012, and 114 full and 50 half cases of cigarettes unloaded into ICSS on September 6, 2012. The box van was again used on September 12-13, 2012 for the trip to Idaho to pick up cigarettes.

83. Again, the Post Falls, Idaho, Police Department operates cameras that photograph vehicles entering Idaho on I-90 and traveling on certain other roads in the Post Falls/Coeur d'Alene area. These cameras showed that the pickup passed through that area on November 22, 2011, February 28, 2012, and March 13, 2012. These roads traveled by this vehicle can be used to access the Coeur d'Alene Indian Reservation and the tribal smoke shops in that area, including Fightin' Creek. It should be noted that not all routes of travel to and from Washington into northern Idaho are covered by cameras.

Affidavit of J. Mark Keller
Page 26

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

Also, the cameras photograph the rear license plate of the vehicles.  If the vehicle is pulling a trailer it will not register with the camera's log unless the search is conducted using the trailer license plate number.

84.    Agents and officers have seen from 80 to 140 cases of cigarettes (960,000 to 1.68 million cigarettes) unloaded from the box van each week and taken into the main store at ICSS (see also the table below at ¶ 115 summarizing the deliveries made by the box van to the main store in May 2012).

E.    <u>Supply of Cigarettes to the ICSS Main Store and Drive Thru From Nick Matheson's Baby Zack's Smoke Shop.</u>

85.    Nick Matheson owns and operates Baby Zack's Smoke Shop located at 7403 Pacific Highway East in Milton, Washington.  This location is less than 5 miles from ICSS.

86.    Comenout family members and associates have traveled to Baby Zack's to obtain cigarettes for both the main store and the drive thru.

87.    The white pickup truck identified in ¶ 79, above, is believed to have been used to pick up cigarettes at Baby Zack's and deliver those to the main store.  The agents and officers investigating this matter obtained on March 28, 2012, a warrant to install a GPS tracking device on this pickup, which was subsequently placed on the vehicle.  The tracker showed that on March 29, 2012, the pickup was driven to Baby Zack's.  During this trip to Baby Zack's, the vehicle engaged in maneuvers consistent with counter-surveillance, specifically by driving in a wide loop near the business rather than traveling straight to the destination at Baby Zack's.

88.    The GPS tracker showed that the pickup initially appeared to be parked near the loading area of Baby Zack's but was later moved to the front of the business before being driven back to ICSS, arriving at 4:51 p.m.  When it arrived at the main store, agents and officers observed two persons unloading boxes appearing to be of the size that could carry cigarettes.

Affidavit of J. Mark Keller
Page 27

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

89.   The white pickup truck has been observed at Baby Zack's and then, shortly after leaving there, at ICSS on June 15 and 26, 2012, and on July 3, 2012.

90.   In addition to the white pickup, a black Chevrolet Tahoe, Washington license 163XLH, has also been used to transport cigarettes from Baby Zack's to the main store at ICSS. This vehicle is registered to Robert and Marlene Comenout at 861 Stevens Road, Toppenish, Washington. This is believed to be Robert Comenout, Jr.

91.   On July 24, 2012, the black Chevrolet Tahoe was observed at Baby Zack's. When it subsequently arrived at the main store later that same day, I saw persons unloading boxes appearing to be the size and shape that could carry cartons of cigarettes and taking them into the main store.

92.   The Tahoe has been observed at Baby Zack's and then, shortly after leaving there, at ICSS on other dates: June 12, 2012, and July 10 and 17, 2012.

93.   <u>Drive Thru</u>:  Cigarettes for the drive thru are also obtained at Baby Zack's. As noted above at ¶ 54, Jeremy Propst is involved in the operation of the drive thru. Steven T. Propst, Jr. has been observed transporting cigarettes from Baby Zack's to the drive thru, usually using a white Kia minivan.

94.   The typical pattern based on visual surveillance by agents and officers is as follows: Generally, each Tuesday and Friday, a 2012 Mercedes Sprinter van, Idaho plate number K499663, arrives at the back gate of Baby Zack's in the afternoon hours. This van is registered to Nicholas Patrick Matheson/Jess's Wholesale located at 12727 W. Elder Road, Worley, Idaho. The Sprinter van backs into a fenced area on the south side of Baby Zack's. It is difficult to observe this fenced area because the fence is approximately 10-12 feet high. In addition, there is a gate in the fence and this is closed after vehicles have entered.

95.   The Sprinter van typically stays only a short time before leaving. Usually within several minutes after the Sprinter van leaves, a white Kia minivan pulls up in front of the gated area and also backs into the area, after which the gates are shut. The driver of the white minivan is usually Steven Propst. The minivan has Washington plate

Affidavit of J. Mark Keller
Page 28

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1 number AFL6317 and is registered to Sandy Set, who appears to live with Steven Propst.

2 Specifically, Steven Propst's driver's license lists as his residence the same address as

3 Ms. Set's: 37508 37th Avenue S., Auburn, Washington.

4    96.    The Kia minivan does not stay long at Baby Zack's.  Within 30 minutes

5 after leaving Baby Zack's the minivan is usually seen at the ICSS drive thru where agents

6 and officers have routinely observed full and half-cases of cigarettes being unloaded from

7 the minivan and taken into the drive thru.  Specifically, agents and officers have seen the

8 pattern described above on the following dates: June 8, 12, 15, 19, 22, and 26, 2012; July

9 3, 6, 10, 13, 17, 24, 27, and 31, 2012; and August 3, 7, 14, 17, 21, 24 and 28, 2012.

10    97.    On August 28, 2012, the Washington State Patrol (WSP) assisted in the

11 agents' surveillance of the Kia minivan during its stop at Baby Zack's via Trooper Noll,

12 who was stationed in a WSP aircraft flying near Baby Zack's.  At approximately 3:30

13 p.m. that day, I saw the Sprinter van back into the fenced area at Baby Zack's.  Trooper

14 Noll then observed a person unloading from the Sprinter van boxes consistent with the

15 size and shape of cigarette cases and half cases and stacking those on the ground behind

16 the van.  He then saw another person bring out stacks of boxes on a handcart from inside

17 Baby Zack's, which were then loaded into the Sprinter van.  Shortly after the Sprinter van

18 left, the Kia minivan pulled into the fenced area vacated by the Sprinter van and persons

19 were seen loading into the Kia van the boxes unloaded from the Sprinter van.  After

20 loading these boxes, the Kia minivan left.  Within 15 minutes, agents saw the Kia

21 minivan arrive at the ICSS drive thru where what appeared to be full and half case of

22 cigarettes were unloaded from the minivan into the drive thru.

23 F.    King Mountain Tobacco Deliveries to ICSS Main Store and Drive Thru

24    98.    King Mountain Tobacco Company, Inc. is a cigarette manufacturer based

25 on the Yakama Reservation in Yakima County, Washington.  *See,*

26 http://www.kingmountaintobacco.com/king-mountain-about.asp (last visited August 20,

27 2012).  The corporate officers of this company are also the corporate officers of

28 Mountain Tobacco Distributing, Inc., which is a licensed cigarette wholesaler in

Affidavit of J. Mark Keller
Page 29

1   Washington.  The president of both corporations is Delbert Wheeler.  It is believed that

2   Trina Wheeler is Delbert's wife.

3        99.     Agents and officers investigating this matter have since approximately

4   March 2012 observed trucks registered to Delbert Wheeler or Trina Wheeler make

5   weekly deliveries of King Mountain cigarettes to both the main store and the drive thru at

6   ICSS including but not limited to recent deliveries occurring on August 22, August 29

7   and September 5, 2012.  These trucks include a: 1) 2008 White Dodge Ram Pickup with

8   a  cube  box  on  the  back  and  Yakima  Tribe  license  #  383  with  VIN:

9   3D6WG46A47G737389 registered to Delbert Wheeler; and 2) 2009 Silver Dodge Ram

10  Pickup with a cube box on the back with Yakima Tribe license # 381 and VIN

11  3D6WH46A58G112787 registered to Trina Wheeler.

12       100.    These deliveries to ICSS almost always occur on Wednesdays, usually

13  between 8:30 and 10:00 a.m.  The pattern is the same each week.  The King Mountain

14  truck first backs up to the drive-thru where 10 to 15 full cases are removed from the truck

15  and placed into the drive thru trailer by a passenger of the truck and workers at the drive

16  thru.  These full cases are unopened, which indicates the cigarettes are likely unstamped

17  and therefore contraband.  *See* ¶ 30.  Agents and officers have seen during the unloading

18  that the boxes are labeled as King Mountain cigarettes.  All of the undercover purchases

19  of King Mountain cigarettes at ICSS have been of unstamped packages.  *See* ¶ 60 (n, p, u,

20  y, z, aa).[14]

21       101.    Once the delivery is made to the drive thru, the truck moves over to the

22  main store of ICSS and backs up to the east side of the building used for other cigarette

23  deliveries.    Approximately 10 to 30 full cases of King Mountain cigarettes are then

24  unloaded from the truck and taken into the main store.  Again, cases that are unopened

25  are very likely unstamped and, therefore, the cigarettes inside these cases are believed to

26  be contraband.

---

27  [14] As noted above at footnote 10, Yakama tribal members may not be prosecuted for substantive CCTA violations
    for transporting contraband cigarettes, but they can be prosecuted for RICO violations predicated on a conspiracy

28  engaged in with non-Yakamas to commit substantive CCTA crimes.

Affidavit of J. Mark Keller
Page 30

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

102.   After the truck is moved over to the main store, the driver of the truck usually walks over to the drive thru, where the driver receives what appears to be a plastic bag.  The driver then takes the bag and places it behind the driver's seat.  On several occasions, agents and officers have observed Steven Propst handing the plastic bag to the driver of the King Mountain truck.  The bag is believed to contain payment, in cash, for the delivery of the cigarettes.  On those occasions when agents and officers can plainly see the bags, they appear to contain the same markings as the bags containing currency seized from Dennis Harris, Jr.'s residence in May 2011 (see below at ¶ 106).  Those bags, white in color, contain the name and telephone number of the ICSS (Indian Country Variety Store) in bold, blue lettering.

103.   After receiving the plastic bag at the drive thru, the driver of the King Mountain truck usually will enter the main store and return with another plastic bag.  This occurs only after the cigarettes have been completely unloaded from the truck.  The bag is placed behind the front seat of the truck and it then leaves ICSS.

104.   On June 13-14, 2012, ATF S/A Goodpaster and ATF TFO Lee Boling conducted surveillance on ICSS.  June 13th was a Wednesday and, consistent with the above-described pattern, the King Mountain truck made its deliveries to ICSS, including the drive thru, that morning.   Later that evening after the drive thru closed, S/A Goodpaster and TFO Boling observed an employee of the drive thru exit the trailer with what appeared to be a white plastic garbage bag.  The employee placed the bag next to a dumpster located to the west of the drive thru.  Several hours later, S/A Goodpaster and TFO Boling picked up the white plastic bag, which was still sitting next to the dumpster and found among the contents of the bag an invoice from King Mountain Tobacco, P.O. Box 422, White Swan, Washington.  The invoice, dated June 13, 2012, contained a section entitled "bill to", in which was written, "Indian Country Store, 908 B River Road, Puyallup, Wa. 98371."   The invoice reflected a purchase of 840 cartons (14 full cases) of King Mountain cigarettes for $15,540.00.  Under the "Terms" section of the invoice are the words "Due on receipt."

Affidavit of J. Mark Keller
Page 31

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

G.     Dennis Harris:  Operation and Management of the Drive Thru at ICSS

105.    The following information demonstrates that Dennis Harris has been and remains involved in the operation and management of the drive thru at ICSS.  On May 28, 2011, the Federal Way Police Department responded to the residence of Dawn Howe and Dennis Harris, 1708 South 371st Court, Federal Way, Washington, regarding a domestic dispute.  After finding narcotics (marijuana) at the residence, the police sought and obtained a search warrant from Federal Way Municipal Court, in King County, for evidence relating to the domestic dispute and narcotics.  Located in the master bedroom, under a desk in several shoe boxes, was a large sum of cash totaling $549,977.45.

106.    Some of the almost $550,000 in cash seized from Harris' residence by Federal Way police was in bags bearing the name, address and telephone number for Indian Country Variety Store, another named used by ICSS.  In addition, the cash was held together by double bands.  As noted above at ¶ 58, photographs taken by WSLCB agents during the execution of the state search warrant on ICSS in July 2008 showed a large sum of money in a safe, most all of which was similarly double banded.

107.    A Post-It note was also located during the search at Howe's and Harris' residence on May 28, 2011.  This Post-It contained hand-written notes stating "FFKBX," "LKBX," "FF100BX," "L100BX," "Medium Camel," "Wides," "Native," "Non Filter," as well as other markings.  Through my knowledge and experience working tobacco investigations, I recognize these phrases and words to be related to cigarettes and are sometimes used for ordering of cigarettes.

108.    In a statement given to the police, Ms. Howe stated that she had been employed at the ICSS and that Dennis Harris was her supervisor at ICSS.  In addition, several documents taken during the Federal Way search connected Howe and Harris to ICSS.  Specifically, authorities found an application for rental agreement in which Harris was identified as a supervisor at ICSS, as well as weekly time cards for employees there. The time cards were marked "paid cash" and contain what appears to be Harris'

Affidavit of J. Mark Keller
Page 32

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1    signature. A currency counting machine was also seized at the residence in the bedroom
2    where most of the currency was located.
3        109.    On May 31, 2011, Federal Way Police Department Detective Brian
4    Klingele contacted Dennis Harris by telephone. Harris stated that some of the over
5    $500,000 recovered from his residence was his and that the money was proceeds from a
6    local smoke shop that he (Harris) managed.
7        110.    On June 3, 2011, AFI Roosendaal, accompanied by officers of the Federal
8    Way Police Department, visited ICSS and was told by employees of the main store that
9    Dennis Harris operates the drive thru on the property. This corroborates the statement
10   made by George Gardee to law enforcement in 2005 that he worked for Harris in the
11   cigarette business at ICSS. *See above* at ¶ 64.
12       111.    Harris and Howe have moved to a new address: 20812 Church Lake Drive
13   East, Bonney Lake, Washington. It appears this house is rented as it is not owned by
14   Harris. Zillow, an online real estate database that provides overall value and monthly
15   rental estimates, estimates the rent for Harris's residence is approximately $2100 per
16   month. *See, http://www.zillow.com/homes/20812-church-Lake-Drive,-bonney-lake-*
17   *washington_rb/* (last visited August 22, 2012).
18       112.    In the last several months, Harris has been observed by agents and officers
19   driving three vehicles:   1) 2006 red Dodge pickup bearing Washington license plate
20   number A65407Y; 2) 2003 white Hummer bearing Washington license plate number
21   AHP0601; and 3) 2009 black Cadillac CTS. The first two vehicles are registered to
22   Harris. Records show that Harris and Ms. Howe have a Cadillac CTS registered to them.
23       113.    Harris has no known source of employment income other than ICSS.
24   Records from the Washington State Employment Security Department show that neither
25   Harris nor Ms. Howe had any reported wages from the third quarter of 2011 through the
26   second quarter of 2012. Harris does receive checks from the Muckleshoot tribe, but the
27   amount of those checks is generally not sufficient to support payments on his housing and
28   automobiles.

Affidavit of J. Mark Keller
Page 33

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

114.    Although Harris does not appear to work a shift at the drive thru, he is seen there on a regular basis.  For example, on May 4, 2012, Harris was observed assisting in unloading approximately 14 cases of cigarettes from the white Kia minivan and taking them into the drive thru.  Similarly, on August 14, 2012, Harris was again seen assisting in the unloading of 12 full and 16 half cases of cigarettes from the Kia minivan into the drive thru.  He has been observed on numerous occasions walking into and out of the drive thru without knocking, talking to others working at the drive thru and has been present at other times when cigarettes were delivered (although he did not assist in the unloading on those occasions).

H.    Summary of Approximate Numbers of Cigarettes Trafficked Through ICSS

115.    Agents and officers investigating this matter have compiled the approximate amounts of cigarettes delivered to ICSS (both the main store and the drive thru) in May 2012.  This provides an estimate of the amount of cigarettes sold through ICSS.  All of these cigarettes appear to be contraband.  These figures show the estimated tax loss to the State of Washington in the month of May 2012 to be almost $1.4 million.

| Date | Day of the Week | Vehicle Description | Vehicle ID | Location | Full Cases | 1/2 Cases | Cartons | WA Excise Tax ($30.25 per Carton) Not Paid |
|---|---|---|---|---|---|---|---|---|
| 05/02/12 | Wednesday | KING MT TRUCK | 383 | Indian Country Store | 30 | 0 | 1,800 | $54,450.00 |
| 05/02/12 | Wednesday | KING MT TRUCK | 383 | Drive Up Trailer | 11 | 0 | 660 | $19,965.00 |
| 05/03/12 | Thursday | BOX TRUCK | B-42758E | Indian Country Store | 77 | 73 | 6,810 | $206,002.50 |
| 05/04/12 | Friday | BLK CHEV SUV | 163XLH | Indian Country Store | 8 | 0 | 480 | $14,520.00 |
| 05/04/12 | Friday | KIA VAN | AFL6317 | Drive Up Trailer | 10 | 4 | 720 | $21,780.00 |
| 05/08/12 | Tuesday | KIA VAN | AFL6317 | Drive Up Trailer | 4 | 30 | 1,140 | $34,485.00 |
| 05/09/12 | Wednesday | KING MT TRUCK | 383 | Indian Country Store | 15 | 0 | 900 | $27,225.00 |
| 05/09/12 | Wednesday | KING MT | 383 | Drive Up | 30 | 0 | 1,800 | $54,450.00 |

Affidavit of J. Mark Keller
Page 34

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

| Date | Day of the Week | Vehicle Description | Vehicle ID | Location | Full Cases | 1/2 Cases | Cartons | WA Excise Tax ($30.25 per Carton) Not Paid |
|---|---|---|---|---|---|---|---|---|
| | | TRUCK | | Trailer | | | | |
| 05/10/12 | Thursday | BOX TRUCK | B-42758E | Indian Country Store | 75 | 66 | 6,480 | $196,020.00 |
| 05/16/12 | Wednesday | KING MT TRUCK | 383 | Indian Country Store | 20 | 0 | 1,200 | $36,300.00 |
| 05/16/12 | Wednesday | KING MT TRUCK | 383 | Drive Up Trailer | 7 | 0 | 420 | $12,705.00 |
| 05/17/12 | Thursday | BOX TRUCK | B-42758E | Indian Country Store | 87 | 39 | 6,390 | $193,297.50 |
| 05/22/12 | Tuesday | KIA VAN | AFL6317 | Drive Up Trailer | 10 | 2 | 660 | $19,965.00 |
| 05/23/12 | Wednesday | KING MT TRUCK | 383 | Drive Up Trailer | 0 | 0 | 0 | $0.00 |
| 05/24/12 | Thursday | BOX TRUCK | B-42758E | Indian Country Store | 84 | 49 | 6,510 | $196,927.50 |
| 05/30/12 | Wednesday | KING MT TRUCK | - | Indian Country Store | 30 | 0 | 1,800 | $54,450.00 |
| 05/30/12 | Wednesday | KING MT TRUCK | - | Drive Up Trailer | 8 | 0 | 480 | $14,520.00 |
| 05/31/12 | Thursday | BOX TRUCK | B-42758E | Indian Country Store | 77 | 50 | 6,120 | $185,130.00 |
| | | | | TOTAL | 608 | 313 | 45,870 | $1,387,567.50 |

| | | | |
|---|---|---|---|
| May week 1 | 136 | 77 | 10,470 | $316,717.50 |
| May week 2 | 124 | 96 | 10,320 | $312,180.00 |
| May week 3 | 114 | 39 | 8,010 | $242,302.50 |
| May week 4 | 119 | 51 | 8,670 | $262,267.50 |
| May week 5 | 115 | 50 | 8,400 | $254,100.00 |
| TOTAL | 608 | 313 | 45,870 | $1,387,567.50 |

## VII.   Nick Matheson and His Involvement in Cigarette Trafficking

116.   Like the Comenout family, Nicholas P. "Nick" Matheson's family has a long history in the cigarette business. For example, Nick's father, Paul Matheson, owned a truck that was used in 2004 to transport over 41,000 packs of contraband cigarettes in

Affidavit of J. Mark Keller
Page 35

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

Washington.  The Washington Court of Appeals upheld the State's seizure and forfeiture of those cigarettes and the vehicle used to transport them, rejecting Paul's arguments that neither he nor the cigarettes were subject to Washington State's cigarette taxation scheme.  *Matheson v. Washington State Liquor Control Board,* 132 Wn. App. 280, 130 P.3d 897 (2006); *see also, Matheson v. Kinnear,* 393 F. Supp. 1025 (W.D.Wash. 1974) (describing early 1970s partnership between Edward Comenout and David Matheson to sell untaxed cigarettes at 908 River Road, the location of ICSS).

117.  Nick Matheson lives near Worley, Idaho, on the Coeur d'Alene Indian Reservation near the intersection of West Elder Road and Highway 95.  There are numerous structures on Matheson's property, including his residence and several outbuildings.

118.  One of the outbuildings located on Matheson's property is located approximately 200 meters from Matheson's residence.  The address associated with this structure is 13155 West Elder Road, Worley, Idaho.  The GPS tracking device placed on the box van driven by Lee Comenout, Sr. and associates indicates that this is the structure where the truck is parked for approximately 30 minutes each week during Lee Sr.'s trips to Matheson's Idaho property.  Based on this, it is believed that this is the building where Lee Sr. and associates pick up the cigarettes that are subsequently unloaded into the main store at ICSS.

119.  Matheson also owns a retail smoke shop named Fightin' Creek Smoke Shop.  This is located at 23181 South Highway 95, Coeur d'Alene, Idaho, approximately two miles from Matheson's residence described above.

120.  In addition, Matheson owns and operates Baby Zack's Smoke Shop located at 7403 Pacific Highway East in Milton, Washington, on the Puyallup Indian Reservation.  It is believed that Baby Zack's is licensed to sell cigarettes by the Puyallup Tribe under the terms of the Puyallup's cigarette compact with the State of Washington.

121.  Nick's sister, Jessica, owned and operated Jess's Wholesale, a cigarette distribution company.  Nick assisted his sister in obtaining a Washington cigarette

Affidavit of J. Mark Keller
Page 36

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

wholesaler's license.   However, in August 2012 the Washington State Department of Revenue revoked the business license by which Jess's Wholesale operated in Washington for failure to pay over $9 million in Washington cigarette taxes and associated penalties and interest.

122.   Nick testified on behalf of his sister in this proceeding.   One of the statements he made during the course of the proceedings before the Washington State Board of Tax Appeals in that matter was that he has a cigarette stamping machine at his residence.

123.   As noted above, agents and officers have purchased contraband "305's" brand cigarettes from ICSS.   This brand of cigarettes is manufactured by Dosal Tobacco Corporation, located in Florida.   *See*, http://www.dosal.com/about_brands.html (last visited, August 20, 2012).   Nick Matheson is the only person or entity in Idaho to which Dosal reports it delivers 305's brand cigarettes.

124.   On December 29, 2011, ATF TFO Lee Boling observed the delivery of black shrink wrapped pallets to an outbuilding located at the northwest corner of Elder Road and Highway 95 near Worley, Idaho, on property owned by Nick Matheson.   This is not the same structure from which the Comenouts appear to pick up their cigarettes, but is located nearby.

125.   TFO Boling subsequently reviewed shipping records from Diamond Lines Delivery Systems.   Included in these records was a freight bill/delivery receipt signed on December 29, 2011, by Nick Matheson and a Diamond Lines driver.   This corresponds to the date and approximate time TFO Boling observed the delivery of the pallets to Matheson's outbuilding.   The delivery receipt describes the articles delivered as 293 cases of cigarettes ("CIGARETTES, TOBACCO . . . 11 SKIDS STC 293 CASES. . . .").   The receipt lists as the party to be billed for this shipment as "Dosal Tobacco Corp, 4775 NW 132nd St, Opa Locka, FL 33054, phone (305) 685-2949."   The consignee is listed as Fightin' Creek, 23181 S HWY 95, Coeur d'Alene, ID, 83814.

Affidavit of J. Mark Keller
Page 37

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

VIII.  **Locations to Be Searched and Summary of Probable Cause For Those Searches:**

126.  The paragraphs above describe in detail the facts establishing probable cause to search multiple locations and to seize at those locations evidence related to violations of various federal statutes, including the CCTA.  This section summarizes the facts establishing probable cause to search each location.

127.  <u>ICSS Main Store</u>:  Agents and officers have made multiple purchases of unstamped and otherwise contraband cigarettes from the main store.  In fact, all of the cigarettes agents and officers have purchased from the main store have been contraband. In addition, agents have observed the delivery to the main store of hundreds of cases of what appear to be unstamped and, therefore, contraband cigarettes.

128.  <u>ICSS Drive Thru</u>:  The facts supporting issuance of a warrant to search the drive thru are similar to those applicable to the main store:  Repeated purchases of unstamped and contraband cigarettes from the drive thru and the delivery to the drive thru of hundreds of cases of contraband cigarettes.

129.  <u>Residence of Robert Comenout, Sr.</u>:  Robert Sr. is an owner and the operator of the main store at ICSS.  He is identified as such in the probate records for his brother's estate, as well as the business license application submitted by him to the Quinault Nation in May 2012.  His residence is connected to the main store where the contraband cigarettes are delivered and sold.  Employees at the main store routinely visit Robert Sr.'s residence during the day.  Finally, agents and officers, including your affiant, have extensive experience in prior contraband cigarette trafficking cases.   Search warrants of the residences of persons operating businesses selling contraband cigarettes have been executed in these cases.  These searches routinely resulted in the seizure of evidence relating to contraband cigarette trafficking, including records, proceeds and contraband cigarettes.

130.  <u>Residence of Dennis Harris</u>:  Dennis Harris appears to have inherited his father's ownership interest in ICSS.  George Gardee and personnel at ICSS have told law

enforcement that Harris works at ICSS and store personnel stated Harris runs the drive thru. Evidence seized during the 2011 search of Harris's home resulted in the seizure of over $500,000, some of which Harris indicated was from the smoke shop. In addition, other evidence seized is consistent with the ordering of cigarettes. Harris continues to visit the drive thru and has recently been observed on several occasions unloading cigarettes and taking them into the drive thru. Harris does not appear to have a job aside from his work at the drive thru and the only income he appears to receive (checks from the Muckleshoot Tribe) is insufficient to support his lifestyle. He has several vehicles of which he is a registered owner and he resides in a home in which the rent is estimated at over $2000 per month. Finally, as with Robert Comenout, Sr., agents and officers, including your affiant, have extensive experience in prior contraband cigarette trafficking cases. Search warrants of the residences of persons operating businesses selling contraband cigarettes have been executed in these cases. These searches routinely resulted in the seizure of evidence relating to contraband cigarette trafficking.

131. 2007 White Chevrolet Box Van: This vehicle has been regularly used by the Comenouts to travel to Nick Matheson's property in Idaho to obtain contraband cigarettes and transport those back to Washington for subsequent sale at the ICSS main store. Probable cause exists to believe that a search of this vehicle is likely to produce evidence of contraband cigarette trafficking, including but not limited to records of the trips to Matheson's Idaho property, records of the cigarettes transported in the truck, contraband cigarettes, and proceeds.

132. 2008 White Chevrolet Silverado Pickup: This vehicle has also been used by the Comenouts to travel to Nick Matheson's property in Idaho, as well Baby Zack's in Milton, Washington, to obtain and transport back to the ICSS main store contraband cigarettes that are later sold at the main store. Probable cause exists to believe that a search of this vehicle is likely to produce evidence of contraband cigarette trafficking, including but not limited to records of the trips to Matheson's properties, records of the cigarettes transported in the truck, contraband cigarettes, and proceeds.

Affidavit of J. Mark Keller
Page 39

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

133.   <u>2008 White Dodge Ram Pickup with Cube Box on Bed</u>:  This vehicle has been used to transport unstamped and untaxed King Mountain cigarettes to the ICSS main store and drive thru.  Probable cause exists to believe that a search of this vehicle is likely to produce evidence of contraband cigarette trafficking, including but not limited to records of the transport of the contraband cigarettes to ICSS, contraband cigarettes, and proceeds.

134.   <u>2009 Silver Dodge Ram Pickup with Cube Box on Bed</u>:  This vehicle has been used to transport unstamped and untaxed King Mountain cigarettes to the ICSS main store and drive thru.  Probable cause exists to believe that a search of this vehicle is likely to produce evidence of contraband cigarette trafficking, including but not limited to records of the transport of the contraband cigarettes to ICSS, contraband cigarettes, and proceeds.

**IX.   Records Related to Contraband Cigarette Trafficking and Related Offenses.**

135.   Individuals who engage or conspire to engage in contraband cigarette trafficking and related crimes such as money laundering often keep in their residence and businesses account books and records in various forms relating to and providing evidence of these illegal activities.

136.   These records may include, but are not limited to:

     a.   Receipts, bank statements, canceled checks, money drafts, wire transfers, letters of credit, money orders and Cashier's Checks, and loan documents;

     b.   Personal calendars, day planners, memoranda, rolodex and/or telephone number lists and telephone records reflecting the telephone numbers and identities of their co-conspirators, account numbers and pseudonyms used relating to off shore or hidden bank accounts, travel expense records, credit card records and other expense records.

137.   These records can show the purchase, transfer, transport, delivery, possession and sale of contraband cigarettes.  They can also provide evidence of the secreting, transfer, expenditure or concealment of assets under both legitimate names and accounts, as well as false names and account numbers.  The records can also show

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1  purchases of real estate, cars and other property made with money generated by the

2  illegal activities.  These records, therefore, can be used to trace or track the flow of funds

3  to and from owners.  In addition, they can be used to identify co-conspirators, witnesses,

4  investors, lenders, and others.

5  ### X.     Evidence To Be Seized

6     138.    The United States and its agents seek authority to seize all evidence which

7  is, may contain or may lead to evidence of violations of 18 U.S.C. §§ 2341 and 2342

8  (Contraband Cigarettes);  18 U.S.C. §§ 1956 and 1957 (Money Laundering), 18 U.S.C. §

9  371 (Conspiracy), 18 U.S.C. § 2 (Aiding and Abetting).  The evidence to be searched for

10  and seized is detailed in Attachment B.

11  A.    Computer Evidence.

12     139.    Overview – Digital Devices at ICSS:  I am seeking authorization to seize

13  and search digital devices[15] from the ICSS main store and drive thru.  As demonstrated in

14  this affidavit, these businesses are permeated with criminal activity as the vast majority of

15  their cigarette sales appear to be sales of untaxed and unstamped contraband cigarettes to

16  non-tribal individuals.  Any legal sales of cigarettes or other non-tobacco products such

17  as candy, etc., appear to be either non-existent or nominal.  As described in more detail

18  below, the searches of the digital devices seized from these businesses will include

19  making a copy of the devices on site, if practicable, the day the warrants are executed.  If

20  not practicable, the devices would be transported to a secure location where such a copy

21  can be made, after which the device will be returned.

22     140.    Overview – Digital Devices at Residences:      I am also seeking

23  authorization to seize digital devices from the residences of Robert Comenout, Sr. and

24  Dennis Harris, Jr., listed and described in Attachment A to this Affidavit.  I am not, at

---

25
26  [15] "Digital device" includes any electronic device capable of processing and/or storing data in digital form, including, but not limited to: central processing units, laptop or notebook computers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related
27  communications devices such as modems, cables and connections, electronic storage media, and electronic/digital security devices, wireless communication devices such as telephone paging devices, beepers, mobile or cellular
28  telephones, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices.

Affidavit of J. Mark Keller
Page 41

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

this time, seeking authority to search devices found in these residences given the considerations particular to digital devices located in residences (e.g., that persons uninvolved in the criminal activities described in this Affidavit may have used the digital devices). If, within a reasonable time after these warrants are executed, the United States wishes to search digital devices seized from the aforementioned residences, the United States will submit an application for a warrant to search those devices.

141. Special Agent (S/A) Christopher Lewis is an expert in computers and digital devices. Specifically, S/A Lewis has approximately eleven (11) years of specialized training and experience in the acquisition, preservation and analysis of digital evidence. S/A Lewis has received specialized training and certification by the United States Department of Defense's Defense Cyber Investigations Training Academy as a *Certified Digital Media Collector* and as a *Certified Digital Forensic Examiner*. S/A Lewis is certified by the International Society of Forensic Computer Examiners as a *Certified Computer Examiner* and by the International Association of Computer Investigative Specialists as a *Certified Forensic Computer Examiner*.

142. S/A Lewis has reviewed the information in the following paragraphs specific to computers, digital devices and digital evidence. He has verified that such information is true and accurate.

143. As described in Attachment B, this application seeks permission to search for all evidence – including records - which is, may contain or may lead to evidence of violations of 18 U.S.C. §§ 2341 and 2342 (Contraband Cigarettes); 18 U.S.C. §§ 1956 and 1957 (Money Laundering), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 2 (Aiding and Abetting). One form in which the records and other relevant evidence of the aforementioned crimes might be found is data stored on digital devices such as computer hard drives or other electronic storage media.[16] Thus, the warrants for which I am applying would authorize the seizure of digital devices or other electronic storage media

---

[16] Electronic Storage media is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

Affidavit of J. Mark Keller
Page 42

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

1  or, potentially, the copying of electronically stored information from digital devices or

2  other electronic storage media, all under Rule 41(e)(2)(B).

3      144.  <u>Probable Cause.</u>  Based upon my review of the evidence gathered in this

4  investigation, my review of information received from other agents and officers,

5  including S/A Lewis, and my training and experience in prior contraband cigarette

6  trafficking cases, I submit that if a digital device or other electronic storage media is

7  found at the ICSS main store and drive thru, and the residences of Robert Comenout Sr.

8  and Dennis Harris, there is probable cause to believe that:  1) evidence of the crimes

9  noted above will be stored on those digital devices or other electronic storage media; and

10  2) the digital devices themselves have been and are being used to facilitate the

11  aforementioned crimes.  Specifically, the ICSS main store and drive thru are businesses

12  selling almost exclusively untaxed and contraband cigarettes.  These businesses are

13  permeated with illegality and, indeed, exist almost solely to facilitate the trafficking and

14  sale of untaxed and contraband cigarettes.  These businesses are managed and operated

15  by Robert Comenout, Sr. and Dennis Harris, respectively.  The quantity of untaxed and

16  contraband cigarettes being sold at these businesses is very large and is, therefore, likely

17  to require some form of record keeping; a task made easier through the use of digital

18  devices such as a computer.  The use of digital devices to store data necessary to conduct

19  the business of contraband cigarette trafficking is also likely because of the large

20  ownership group involved in the main store and drive thru at ICSS.  The extended

21  ownership structure means that some form of record-keeping is necessary to provide

22  information on sales and profits to the group of owners; record keeping that can be done

23  most efficiently with the assistance of computers and digital devices.  Finally, it is also

24  likely that computers and digital devices are being used to facilitate the contraband

25  cigarette trafficking and related offenses by, for example, being used to track inventory

26  and to order new stock from the ICSS suppliers, Nick Matheson and King Mountain.  I

27  expect that the digital devices likely contain evidence of the aforementioned offenses,

28  including but not limited to purchase orders and inventory, records relating to the source

Affidavit of J. Mark Keller
Page 43

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

of the contraband cigarettes, and records related to the **payment and location of money** related to the contraband cigarette trafficking. All of the **foregoing is supported by my** experience and that of my fellow agents and officers **in other contraband cigarette** trafficking cases. Specifically, in these other cases, **agents and officers found digital** devices to have been used to facilitate contraband **cigarette trafficking and found** evidence of such trafficking on digital devices. These **devices have been found in both** businesses selling contraband cigarettes, as well as in **the residences of those persons** managing and operating the businesses.

145. Computer files or remnants of such files **can be recovered months or even** years after they have been downloaded onto a storage medium, **deleted, or viewed via the** Internet. Electronic files downloaded to a storage medium **can be stored for years at little** or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. **Therefore, deleted files, or** remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

146. Wholly apart from user-generated files, **computer storage media-in** particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. **To give a few examples,** this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically **do not erase or delete this** evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, **files that have been viewed via**

1    the Internet are sometimes automatically downloaded into a temporary Internet directory

2    or "cache."

3        147.    This Affidavit seeks permission to locate not only computer files that might

4    serve as direct evidence of the crimes described herein, but also for forensic electronic

5    evidence that establishes how digital devices were used, the purpose of their use, who

6    used them, and when. There is probable cause to believe that this forensic electronic

7    evidence will be on any digital devices found at the locations to be searched because:

a.    Data on a digital device can provide evidence of a file that was once
      on the digital device but has since been deleted or edited, or of a
      deleted portion of a file (such as a paragraph that has been deleted
      from a word processing file). Virtual memory paging systems can
      leave traces of information on the digital device that shows what
      tasks and processes were recently active. Web browsers, e-mail
      programs, and chat programs store configuration information on the
      digital device that can reveal information such as online nicknames
      and passwords. Operating systems can record additional
      information, such as the history of connections to other computers,
      the attachment of peripherals, the attachment of USB flash storage
      devices or other external storage media, and the times the digital
      device was in use. Computer file systems can record information
      about the dates files were created and the sequence in which they
      were created.

b.    Forensic evidence on a digital device can also indicate who has used
      or controlled the device. This "user attribution" evidence is
      analogous to the search for "indicia of occupancy" or evidence of
      "dominion and control" while executing a search warrant at a
      residence. For example, registry information, configuration files,
      user profiles, e-mail, e-mail address books, "chat," instant messaging
      logs, photographs, the presence or absence of malware, and
      correspondence (and the data associated with the foregoing, such as
      file creation and last-accessed dates) may be evidence of who used
      or controlled the computer or storage medium at a relevant time.

c.    A person with appropriate familiarity with how a computer works
      can, after examining this forensic evidence in its proper context,
      draw conclusions about how computers were used, the purpose of
      their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries,
      logs, or other forms of forensic evidence on a digital device that are

necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves and the context of the particular investigation. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device. For example, although there is no specific evidence concerning the use of malicious software in this investigation, it is possible that such software can be installed on a computer, often without the computer user's knowledge, that can in turn make the computer accessible by others, sometimes without the knowledge of the computer owner. To investigate the crimes described in this affidavit, it may be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other items found on the digital device and/or electronic storage medium. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent.

148.   <u>Necessity of seizing or copying entire computers or storage media</u>. In most cases, a thorough search of premises for information that might be stored on digital devices often requires the seizure of the physical storage media and later off-site review consistent with the warrant. This is true because of the following:

a.   <u>The time required to acquire a forensic clone or image</u>. In all cases, the acquisition of a forensic clone or image of the storage media is necessary for proper preservation of the evidence, to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. A forensic clone or image is a bit for bit, true and correct copy of the storage media or in essence, a complete electronic picture or "snapshot" of the storage media, including all hidden sectors and delete files, as it was at the time of seizure. In

Affidavit of J. Mark Keller
Page 46

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

lieu of removing storage media from **the premises, it is sometimes** possible to acquire the forensic **clone or image of storage media on** scene. However, today's storage **media consists of** storage capacities in excess of one (1) Terabyte (1,000 Gigabytes or 1,000,000 Megabytes). As such, it generally takes **several hours to** acquire each of the forensic **clones or images, often making it** impractical or overly intrusive to **complete while remaining at the** premises.

b.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be **easily** viewed on site. Analyzing evidence of how a **computer has been** used, what it has been used for, **and who has used it requires** considerable time, and taking that much time on premises could **be** unreasonable. As explained above, because **the affidavit calls for** forensic electronic evidence, it is exceedingly likely **that it will be** necessary to thoroughly examine storage **media to obtain** evidence. Storage media can store a large volume **of** information. Reviewing that information for things **described in the** warrant can take weeks or months, depending on the volume of **data** stored, and would be impractical and invasive to attempt on-site.

c.      Technical requirements. Digital **devices can be configured in** several different ways, featuring a variety of **different operating** systems, application software, and configurations. Therefore, searching them sometimes requires tools or **knowledge that might** not be present on the search site. The vast array of **computer** hardware and software available makes it difficult to know **before a** search what tools or knowledge will be required to analyze **the** system and its data at the location **where they are found. However,** taking the digital devices off-site and reviewing **them in a controlled** environment will allow an examination **with the proper tools and** knowledge.

d.      Variety of forms of electronic media. Records sought under **this** affidavit could be stored in a variety of **storage media formats that** may require off-site reviewing with specialized forensic tools.

149.    Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, when persons executing the warrants conclude that it would be impracticable to review the digital devices on-site, **the warrants for which I am** applying will permit seizing or imaging digital devices that reasonably appear capable of

Affidavit of J. Mark Keller
Page 47

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

containing data or items that fall within the scope this affidavit, thus permitting their later examination consistent with the warrants.

150.    Because persons not involved in the crimes and conspiracy detailed in this Affidavit may occasionally reside at the residences to be searched, it is possible that these residences will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  As a result, at this time I am requesting only authorization to seize digital devices found at these residences.  If agents subsequently wish to search any digital devices seized from the residences, they will within a reasonable time submit an application for a warrant to conduct such a search.

151.    Consistent with the above paragraph, the following paragraphs pertain only to the search of digital devices found at the ICSS main store and drive thru:  As with any search warrant, I expect that these warrants will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the company's legitimate business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

152.    Consistent with the above, I hereby request the Court's permission to seize and/or obtain a forensic clone or image of digital devices that reasonably appear capable of containing data or items that fall within the scope of this affidavit, and to conduct off-site searches of the digital devices and/or forensic images, using the following procedures:

   a.    Upon securing each physical search site, the search team will conduct an initial review of any digital devices/systems located at each location that are capable of containing data or items that fall

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

within the scope of this affidavit to determine if it is possible to secure the data contained on these devices on site in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

b.   In order to examine the electronically store information (ESI) in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of any digital device that is capable of containing data or items that fall within the scope of this Affidavit.[17]

c.   A forensic image may be created of either a physical drive or a logical drive. A physical drive is the actual physical hard drive that may be found in a typical computer. When law enforcement creates a forensic image of a physical drive, the image will contain every bit and byte on the physical drive. A logical drive, also known as a partition, is a dedicated area on a physical drive that may have a drive letter assigned (for example the c: and d: drives on a computer that actually contains only one physical hard drive). Therefore, creating an image of a logical drive does not include every bit and byte on the physical drive. Law enforcement will only create an image of physical or logical drives physically present on or within the subject device. Creating an image of the devices located at the subject premises will not result in access to any data physically located elsewhere. However, digital devices at the subject premises that have previously been connected to devices at other locations may contain data from those other locations.

d.   In addition to creating an image of a physical or logical drive from a digital device, law enforcement may attempt to create an image of the random access memory (RAM) of a digital device. Agents may only create an image of a digital device's RAM if the computer is powered on at the time of the search. This is because RAM is only

---

[17] The purpose of using computer personnel to conduct the imaging of digital devices is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures. When the investigative agent is a trained computer examiner, it is not always necessary to separate these duties. Prior to recent court-imposed limitations on the conduct of ESI search warrants, computer personnel typically worked closely with investigative personnel in all investigations involving digital evidence to assist investigators in their search for digital evidence. The point of using computer personnel to segregate data in a digital investigation was typically technological rather than legal. Computer personnel are needed because they generally have technological expertise that investigative agents do not possess. Computer personnel, however, typically lack the factual and investigative expertise that an investigative agent may possess on any given case. Therefore, it is important that computer personnel and investigative personnel work closely together. In more complex computer investigations, especially those involving computer intrusions, law enforcement will often assign an investigative agent with training and experience in computer examinations and/or computer science because of the importance of combining the investigative and technological skills.

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

active when the device is in operation.  Any data contained in the RAM will be lost when the computer is powered off.  A computer's RAM may contain evidence related to who else is logged onto the computer (even remotely), open connections that might indicate a program is waiting for commands, passwords for encryption programs, hardware and software settings, maps of recent files and applications accessed, and information related to what communication vendors have recently been utilized on the device (i.e. instant messaging services, e-mail services, social networking sites, etc.).   In addition, RAM may contain encryption keys necessary to access other elements of the subject device.

e.    If based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site image within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices will be seized and transported to an appropriate law enforcement laboratory to be forensically imaged and reviewed.

153.    Searching the forensic images for the items described in this affidavit may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrants, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrants.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to this affidavit.

154.    Agents may utilize hash values to exclude certain known files, such as the operating system and other routine software, from the search results.  However, because the evidence I am seeking does not have particular known hash values, agents will not be able to use any type of hash value library to locate the items identified in this affidavit.

Affidavit of J. Mark Keller
Page 50

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970

155. If, after conducting its examination, law enforcement personnel determine that any digital device is an instrumentality of the criminal offenses referenced above, the government may retain that device during the pendency of the case as necessary to, among other things, preserve the instrumentality evidence for trial, ensure the chain of custody, and litigate the issue of forfeiture. If law enforcement personnel determine that a device was not an instrumentality of the criminal offenses referenced above, it shall be returned to the person/entity from whom it was seized within 90 days of the issuance of the warrant, unless the government seeks and obtains authorization from the court for its retention. Unless the government seeks an additional order of authorization from any Judge in this District, the government will return any digital device that has been forensically copied, that is not an instrumentality of the crime, and that may be lawfully possessed by the person/entity from whom it was seized, to the person/entity from whom it was seized within 90 days of seizure."

## XI.  Conclusion

Based on the foregoing information, I believe the ICSS, the residences and vehicles described in herein, contain contraband cigarettes and/or other evidence relating to violations of Title 18, U.S.C., Sections 2342 and 2343 (Contraband Cigarettes), Title 18, U.S.C., Section 371 (Conspiracy) and Title 18, U.S.C., Sections 1956 and 1957 (Money Laundering).

_____
J. MARK KELLER
Special Deputy United States Marshal


SUBSCRIBED and SWORN TO before me this _____ day of September, 2012.



_____
KAREN L. STROMBOM
United States Magistrate Judge

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington
(206) 553-7970